**STATE of Minnesota, Respondent,**

v.

**Linda R. LOPEZ (C9–95–714), Daniel J. Shekore (C0–95–715), Roger D. Albro (C2–95–716), Appellants.**

**Nos. C9–95–714, C0–95–715 and C2–95–716.**

Court of Appeals of Minnesota.

Oct. 10, 1995.

Thomas P. Martin, Assistant City Attorney, Moorhead, for Respondent.

Richard D. Varriano, Moorhead, for Appellants.

Considered and decided by NORTON, P.J., and RANDALL and DAVIES, JJ.

## OPINION

DAVIES, Judge.

In this consolidated appeal from three separate DWI convictions, appellants challenge the trial court's denial of their motions to exclude evidence obtained after unrecorded implied consent advisories were given, based

on its holding that the reading of an implied consent advisory is not a custodial interrogation triggering the electronic recording requirement set forth in *State v. Scales,* 518 N.W.2d 587 (Minn.1994). We affirm.

## FACTS

Appellants Linda R. Lopez, Daniel J. Shekore, and Roger D. Albro were arrested on separate occasions for driving under the influence of alcohol (DWI). Following their arrests, each was taken to the Clay County Law Enforcement Center and given standard implied consent advisories. All three appellants agreed to take the test, and all were found to have blood-alcohol concentrations in excess of .10.

Prior to their DWI trials, appellants separately filed motions to exclude evidence obtained after the reading of the implied consent advisory, including the alcohol concentration test results. Appellants argued that the officers' failure to electronically record the reading of and responses to the implied consent advisory violated the recently established requirement that custodial interrogations in places of detention be recorded. *Scales,* 518 N.W.2d at 592. The trial court denied the motions to exclude, holding that the reading of an implied consent advisory is not a custodial interrogation subject to the *Scales* decision.

Appellants were separately tried and convicted of DWI on stipulated facts. They appeal.

## ISSUE

Is the reading of an implied consent advisory a "custodial interrogation" triggering the *Scales* recording requirement?

## ANALYSIS

■ On appeal of the denial of a suppression motion, this court "may independently review the facts and determine, as a matter of law, whether the evidence need be suppressed." *State v. Othoudt,* 482 N.W.2d 218, 221 (Minn.1992).

In *Scales,* our supreme court held that all custodial interrogation including any information about rights, any waiver of those

rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention.

518 N.W.2d at 592. If the trial court deems a violation of the recording requirement "substantial," any statements obtained must be suppressed. *Id.*

It is not disputed that the Clay County Law Enforcement Center is a place of detention, and thus strict compliance with *Scales* is required for any "custodial interrogation" at the facility. Thus, the only issue on appeal is whether the reading of the implied consent advisory is a "custodial interrogation," triggering *Scales.*

Both federal and Minnesota law plainly indicate that no custodial interrogation occurs when an implied consent advisory is given. The United States Supreme Court has held:

In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda.*

*South Dakota v. Neville,* 459 U.S. 553, 564 n. 15, 103 S.Ct. 916, 923 n. 15, 74 L.Ed.2d 748 (1983); *see also Pennsylvania v. Muniz,* 496 U.S. 582, 605, 110 S.Ct. 2638, 2652, 110 L.Ed.2d 528 (1990) (implied consent advisory involves "limited and focused inquiries" that are "not likely to be perceived as calling for any incriminating response"). Several Minnesota decisions have cited *Neville* in holding that no interrogation takes place when the implied consent advisory is given. *Nyflot v. Commissioner of Pub. Safety,* 369 N.W.2d 512, 516 (Minn.1985); *State v. Gross,* 335 N.W.2d 509, 510 (Minn.1983); *State v. Whitehead,* 458 N.W.2d 145, 148 (Minn.App. 1990), *review denied* (Minn. Sept. 14, 1990).

■ Appellants assert, in effect, that the above-cited Minnesota cases are no longer applicable because they pre-date Minn.Stat. 169.121, subd. 1a, which now makes it a crime to refuse to take the alcohol concentration test. They argue that when a driver is asked to take the test, the question calls for a potentially incriminating response (i.e., a refusal), and therefore the questioning is a

custodial interrogation. Our supreme court has rejected that analysis, however, holding that the criminal penalties do not convert the reading of an implied consent advisory into "interrogation" for purposes of the privilege against self-incrimination. *McDonnell v. Commissioner of Pub. Safety*, 473 N.W.2d 848, 855–56 (Minn.1991). Because no interrogation is involved, the *Scales* recording requirement is not applicable. 518 N.W.2d at 592. Our holding follows those of two other panels from this court, *State v. Gilmartin*, 535 N.W.2d 650 (Minn.App.1995), *review denied* (Minn. Sept. 20, 1995), and *Umphlett v. Commissioner of Pub. Safety*, 533 N.W.2d 636 (Minn.App.1995), *review denied* (Minn. Aug. 30, 1995).[1]

### DECISION

The trial court correctly held that the reading of an implied consent advisory is not a "custodial interrogation" triggering the *Scales* electronic recording requirement. Therefore, it properly denied appellants' motions to exclude all evidence obtained after the reading of the unrecorded advisories.

**Affirmed.**

RANDALL, Judge, concurring specially.

I concur in the result, but I write separately to address two issues.

### 1. *Supervisory Power*

The majority in a footnote expressly declines to address the issue of the supervisory power of the Minnesota Court of Appeals over the administration of justice. I agree with the majority's decision not to expressly adopt the limitation expressed by other panels of this court. *See State v. Gilmartin*, 535 N.W.2d 650, 653 (Minn.App.1995) (declining

to exercise supervisory powers reserved to supreme court); *Umphlett v. Commissioner of Pub. Safety*, 533 N.W.2d 636, 640 (Minn. App.1995) (same). I do not argue with the *Gilmartin* and *Umphlett* panels, but only suggest that our court should not be so quick to suffer the soft impeachment.

In reality, *all* constitutional courts have express and implied supervisory powers over matters that come before them. By statute, courts are expressly allowed to dismiss criminal actions on their own motion in the furtherance of justice. Minn.Stat. § 631.21 (1994).[2] Trial courts can dismiss a criminal case when they observe particularly egregious conduct of the prosecution or law enforcement. *Id.*

The trial courts have the inherent power to state that even though there is probable cause to believe that the crime was committed and the matter could proceed to trial, they are going to throw it out (and this power can be exercised even during the course of the trial) because our constitutional concept of due process for our citizens mandates that *this* case against *this* citizen proceed no further. Thus, if trial courts have the express benefit of section 631.21 (I note that the statute is not limited to trial or district courts, but merely states "the court" and we are "a court") and the supreme court has supervisory power, it requires no stretch of the imagination to assume that panels of the Minnesota Intermediate Court of Appeals can dip their toes in the supervisory waters if and when needed.

All appeals from district courts, with only a few limited exceptions not at issue, such as election appeals and murder in the first degree, come directly to this court for review.

1. Both *Gilmartin* and *Umphlett* state that, because this court does not have supervisory power over the administration of justice, it cannot extend *Scales* to cover an implied consent advisory. *Gilmartin*, 535 N.W.2d at 653; *Umphlett*, 533 N.W.2d at 640. We decline to address the issue of what supervisory power this court may have, but see the concurrence, which is compelling on this point.

2. Section 631.21 provides:
   The court may order a criminal action, whether prosecuted upon indictment or com-

plaint, to be dismissed. The court may order dismissal of an action either on its own motion or upon motion of the prosecuting attorney and in furtherance of justice. If the court dismisses an action, the reasons for the dismissal must be set forth in the order and entered upon the minutes. The recommendations of the prosecuting officer in reference to dismissal, with reasons for dismissal, must be stated in writing and filed as a public record with the official files of the case.

The Minnesota Rules of Civil Appellate Procedure and Criminal Procedure give us the power to examine the record, affirm, reverse, or modify everything, including the exercise of supervisory powers by a district court. *See* Minn.R.Civ.App.P. 103.04; Minn. R.Crim.P. 28.01.

In addition, Minnesota trial courts routinely exercise supervisory powers over attorneys in the administration of justice. For instance, on issues of pretrial discovery, attorney conduct, and other related matters, courts sanction, limit, fine, and in extreme cases prevent witnesses from taking the stand, dismiss counts, strike an affirmative defense, and in some instances dismiss entire cases. *See* Minn.Stat. § 631.21 (stating court may dismiss criminal case in the furtherance of justice); Minn.R.Civ.P. 37.02 (stating sanctions for party's failure to comply with discovery order); Minn.R.Civ.P. 37.04 (stating sanctions for party's failure to attend own deposition or serve answers); Minn.R.Civ.P. 41.02 (stating rule for involuntary dismissal for party's failure to prosecute claim or failure to comply with rules of civil procedure). Those supervisory sanctions by trial courts are appealed to this court where we have the power to affirm, reverse, or modify.

On all matters before this court, we have the power to criticize, sanction, impose monetary fines, limit or deny oral argument, etc. when we observe a breach of the rules of appellate procedure.

In addition, any cursory examination of *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966), shows that its background is not a deep-seated fundamental constitutional right to have an artificially crafted series of warnings read before custodial interrogation. *Miranda* is simply a fairly recent statement by the United States Supreme Court that, to prevent abuse, henceforth all custodial interrogation must be preceded by a reading of the *"Miranda* rights," and all federal and state trial courts and intermediate courts of appeal apply *Miranda.* This court has affirmed trial courts that have suppressed confessions for lack of a *Miranda* warning, and at times this court has reversed trial courts

that did not find custodial interrogation, but we did.

It cannot be that we have no authority to extend *State v. Scales,* 518 N.W.2d 587 (Minn.1994), to the crime of refusal to submit to testing merely because that extension is an open question (the supreme court has not yet addressed that issue). Routinely, trial courts and intermediate appellate courts listen to the arguments of attorneys who claim a logical extension of some precedent is called for on a particular set of facts. This happens in both civil and criminal cases. Trial courts have the discretion to make or deny extensions, and this court has the authority to make or deny extensions.

The "double jeopardy issue" concerning whether implied consent civil penalties and DWI criminal penalties can be laid on the same driver for the same offense is the most recent and, a classic example, of how trial courts and intermediate appellate courts legitimately consider the extension of precedent. The precedent, of course, is the prohibition of double punishment contained in the Fifth Amendment of the Bill of Rights.

This issue is sweeping state courts throughout the country, based on *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), and its progeny. The Minnesota Supreme Court has not yet addressed the issue, thus it is an open issue. Some Minnesota trial courts have extended the "*Halper* doctrine" to implied consent/DWI and other trial courts have not. We do not know yet what the final outcome will be, but no one questions the inherent authority of the Minnesota trial court to look at the arguments for extending the *Halper* doctrine, and then decide to extend it or not extend it. In exactly the same vein, this court has the inherent authority to look at those same arguments and extend the *Halper* doctrine to implied consent/DWI or not extend it.

Thus, any discussion of "supervisory powers" has to be limited to "which supervisory power"? Restrictions on our supervisory powers are rare. The Minnesota Court of Appeals does not get involved in attorney discipline, but we have far more areas of supervisory power than we do not.

### 2. *Does Scales apply to implied consent?*

The Minnesota Supreme Court in *Scales* held that all custodial interrogation including any information about rights, any waiver of those rights, and all questioning must be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention. *Scales*, 518 N.W.2d at 592. *Scales* applies to the conversations preceding the giving of the *Miranda* warning and the giving of the *Miranda* warning itself. To date, the Minnesota Supreme Court has not expressly addressed the issue of whether *Scales* extends to conversations preceding the reading of the implied consent advisory and the reading of the implied consent advisory itself.

I suggest that if the life of the law were logic, *Scales* would first have been applied to implied consent advisory issues and the "refusal to submit to testing" crime. *See* Minn. Stat. § 169.121, subd. 1a (1994).[3] I suggest this because the implied consent advisory is an essential element of the crime in and of itself, but the reading of the *Miranda* warning is not. If it makes sense to electronically record the custodial interrogation surrounding the *Miranda* warning (which itself is not a crime), and *Scales* says it does make sense, it makes even more sense to electronically record the conversation between drinking drivers and law enforcement before the reading of the implied consent advisory and during the reading itself.

In Minnesota, the reading of the *Miranda* warning is not an essential element of any crime. When law enforcement intones the first magic words of *Miranda*, "You have the right to remain silent"—nothing happens. The defendant, the person being questioned, can say "yes sir, I understand it"; "no sir, I don't understand it"; "I don't want to hear any more"; "please read me the whole thing

twice"; "I want my attorney here before you go any further and he can't be here for two days"; the defendant can hear the entire *Miranda* warning recited, then begin to talk; then stop and change his mind; then later change his mind and start talking again; then later change his mind and refuse to talk until his attorney (who may be one hour, or one day, or one week away) shows up, and so on and so forth. After hearing the full *Miranda* warning, a defendant can turn his back, walk into a corner of the room, chew gum, suck his thumb, and refuse to speak a word or speak gibberish. None of those actions are bad and none of those actions form the basis of any crime.

Exactly the opposite is true when law enforcement intones the first right of the Minnesota Implied Consent Advisory. At that precise moment the crime of refusal to submit to testing is on, "the game's afoot." The officer will finish reading the advisory regardless of the defendant's wishes. Following vindication of the defendant's limited right to consult with an attorney, the defendant has no option to state that "I won't decide until my attorney gets here," or "I won't talk at all." The defendant has no option to remain silent, chew gum in the corner without talking, or speak gibberish. Every single one of those acts will be translated by the prosecutor to a refusal to submit to testing and *the refusal to submit to testing in and of itself is a crime*. *See* Minn.Stat. § 169.121, subd. 1a.

The *Miranda* warning is not an essential element of a crime. The Minnesota Implied Consent Advisory, *is* an essential element of a serious crime. The state has to prove as one of the essential elements of the crime of refusal to submit to testing that the advisory was read to the driver. *See* Minn.Stat. § 169.123, subd. 2(b) (1994).[4]

---

3. Section 169.121, subd. 1a provides:
   It is a crime for any person to refuse to submit to a chemical test of the person's blood, breath, or urine under section 196.123.

4. Section 169.123, subd. 2(b) provides that When an officer requests an implied consent test, the driver must be informed:
   (1) that Minnesota law requires the person to take a test to determine if the person is

under the influence of alcohol or a controlled substance * * *;
   (2) that refusal to take a test is a crime;

       *     *     *     *     *     *

   (4) that the person has the right to consult with an attorney, but that this right is limited to the extent that it cannot unreasonably delay administration of the test.

If there is a need to record the discussions surrounding the reading of the *Miranda* advisory, which is merely an advisory coming before discussion of a real crime, then there is even more need to record the discussions surrounding the reading of an advisory, which is an essential element of a real crime: The crime of refusing to submit to testing after hearing the advisory.

Logically, the good sense of *Scales* should first have been applied in the implied consent context. Then later on someone could have observed:

Because this rule is working so well, and has cut down on claimed abuses by law enforcement, perhaps we should extend it to the reading of other advisories which, although not an essential element of a crime in and of themselves, are nevertheless important. One such advisory we should consider extending *Scales* to is a reading of the *Miranda* warning.

But we have not done it that way. Thus, the issue has to be approached from the standpoint of, if we apply *Scales* to crimes, why do we refrain from applying *Scales* to a particular crime?

There is another extremely practical reason why, if *Scales* applies to the *Miranda* warning, it should apply to the implied consent advisory. If you have been involved in criminal law, investigation, detention, arrest, questioning, etc., you will have observed that in the vast majority of cases, people to whom the *Miranda* warning is given, for crimes other than DWI, are sober.

Not many crimes involve the immediate detention, arrest, and questioning of a defendant on the scene of the crime or within minutes after. Most take place a few days or a few weeks or perhaps even a few months after law enforcement has compiled the necessary information to make an arrest. If the defendant had committed the crime, whether high on alcohol or some other drug, the effect has long since dissipated.

There are occasions when detention, arrest, and custodial interrogation take place shortly after the commission of a crime. But first I note that not all defendants are intoxicated when they commit crimes. And if they

are, the wise police officer and the wise prosecutor will let them "sober up" before questioning begins. The reason is simple. Good law enforcement understands that if they take a confession from someone under the influence, it is going to be attacked, probably suppressed, or, if admitted, its credibility weakened. The defendant and his attorney can advance the honest argument that the confession is invalid because it was not the voluntary product of a person capable of understanding the questions and the seriousness of the admissions. Basically, confessions taken after a *Miranda* warning are from sober people. They might be scared, they might be nervous, they might be in a state of near panic, but they are generally not .08 to .10 or higher.

The exact opposite is true with the reading of the implied consent advisory. It is read to drinking drivers who, if they test, will more often than not score (this statement does not reflect upon the accuracy of the score which can be the subject of other challenges not at issue) something just below .10 to a range of .10 to .20, sometimes between 2.0 and 3.0, and sometimes higher.

Appellate files are replete with cases where the defense to an implied consent advisory violation includes, without limitation, "I was too drunk to understand it" or "I don't remember the officer reading it," or "I asked to call an attorney but they wouldn't give me a phone or a phone book," or "he told me I could go home right away if I gave him some kind of test, but I would go to jail if I didn't," or some other defense that is completely at odds with the law officer's recollection of the conversation preceding the reading of the implied consent advisory and the reading itself.

Is there a fair fight between a drinking driver and an officer when they come to court to test either the civil side or criminal side of implied consent, or go to trial on the criminal side? Minn.Stat. § 169.121, subd. 1a (criminal offense to refuse to submit to testing). The answer is, of course not. Trial courts, appellate courts and lay juries take a common sense approach to things and generally conclude that a large amount of alcohol

does not enhance either memory or credibility.

When it comes down to the issue of credibility, with no *Scales* electronic recording to support the driver or the officer, the entire hearing swings on "I said, he said." Law enforcement prevails an inordinate number of times. *Scales* corroborates that fact; "the trial and appellate courts consistently credit the recollections of police officers regarding the events that take place in an unrecorded interview * * *." *Scales,* 518 N.W.2d at 591 (citations omitted). I suggest juries and judges do not tend to believe the word of a .17 who soiled his pants over the word of an officer in a starched uniform who is dead sober.

So now the issue is defined. Can drinking drivers be taken advantage of by law enforcement in implied consent situations, just as the supreme court in *Scales* found other criminal defendants were sometimes being taken advantage of by law enforcement, during those long minutes or long hours in custody in a police station during questioning and interrogation, but before the formalized reading of the *Miranda* warning?

For instance, is it possible that a drinking driver is right when he says something was never said, when the officer says it was? I suggest it is possible. Is it possible when a drinking driver said he was not offered a telephone book nor any chance to call an attorney, and the officer said he was, that it didn't happen the way the officer said. I suggest it is possible.

We know it is "possible." That is precisely the underpinning of the supreme court's rationale in *Scales.* Courts were getting tired of hearing the litany from defendants that prior to the reading of the *Miranda,* there was a five minute, or a 30 minute, or a two hour conversation during which the defendant claims he was threatened, or coerced, or abused, or pressured, or promised bail immediately if he talked, or promised that "things will go easy with you if you talk," and so on, and so forth. There are enough appellate cases on the shelf corroborating the defendant's version, or at least putting law enforcement's version in serious doubt so that the Minnesota Supreme Court, ahead of al-

most all other states, issued *Scales,* an electronic recording requirement for custodial interrogation, with suppression as the sanction.

Thus, our knowledge of investigation, detention, arrest, questioning, and criminal justice mandates that if *Scales* is important enough to be part of the fabric of reading a *Miranda* warning, a non-crime, it is even more important that *Scales* be part of the fabric of reading the implied consent advisory, an essential element of a serious crime.

Minnesota does not like drinking drivers. We are one of a handful of states that has intertwined the civil side of implied consent with the criminal side by making it a serious crime with serious penalties for refusal to submit to testing, in addition to the civil and criminal penalties for submitting to testing and flunking, and civil penalties for refusing to test.

With the addition of refusal to submit to testing as a separate and distinct crime, Minnesota's web of implied consent civil and criminal sanctions is the third rail of drinking and driving. "Touch it, and go directly to jail, do not pass Go."

Consider the following scenario: A Commissar in the late 1940s asks a trembling citizen, "Do you love Mother Russia?" The citizen answers that he does not and the Commissar states you have just committed the crime of treason—off to Siberia. The next citizen in the courtroom observing that, answers that he does love Mother Russia. The Commissar states that anyone who loves a country like this with our system must be crazy and states that is a civil offense—off to Siberia. The next citizen observing the proceedings, and knowing either answer will bring the same result, says politely that he would like to exercise his right to remain silent. The Commissar then states that you have committed the crime of refusing to answer—off to Siberia.

Minnesota treats drinking drivers as criminals. Because we treat drinking drivers as criminals, we should treat drinking drivers as criminals. We should extend to the drinking driver/citizen the same inherent constitutional protection and supervisory power protec-

tion we give to other citizens accused of serious crimes.

The intermingling and intertwining between civil implied consent and criminal DWI is now complete with the addition of the crime of refusal to submit to testing. I do not think it possible to separate them into any coherent understandable distinct tracks, each with separate protection for the citizen, each with separate and distinct penalties and sanctions for failure. It is not enough to state disingenuously that the solution is simple, people should not drink and drive. I agree that is a laudable goal. But it is equally disingenuous to claim that people who rob banks should be deprived of constitutional rights because all they have to do to avoid putting themselves in a situation where they might incur penalties is to stop robbing banks.

If we are going to keep in the criminal code the refusal to submit to testing as a crime, I suggest the present system cannot be maintained. I suggest there is a way out. At least there is a way to ameliorate some of the present problems with constitutional overtones.

First and foremost, the State of Minnesota has an announced policy that they want drivers to take the test when offered. That cannot be denied since in our eagerness to urge citizens to test we have made it a crime to refuse to do so (with the accompanying incongruity that you could be dead sober and a teetotaler all your life and still be guilty of refusing to test). Thus, if a citizen does his or her duty and takes the test, there should be no implied consent penalties for scoring a .10 and higher. A citizen should be thanked for doing what they were supposed to do by at least not penalizing them. A citizen should be told that there are no implied consent civil penalties whatsoever for taking the test, *but* that if you score a .10 or higher, the evidence can be used against you in a later criminal DWI trial. That would remove one serious overlap and would improve, if not eliminate, the double jeopardy issue.

Also, if there is a refusal to submit to testing, the state should be required to select either the crime of refusal to submit to testing with its higher burden of proof, i.e., proof beyond a reasonable doubt, or select the civil violation of refusing to consent with its lower burden of proof. In short, the state should be free to select either option depending on the strength of its case, but be required to make an announced selection and be required to rise or fall with it. An option worth considering is restoring a refusal to test to just a civil matter, not a criminal one. That would aid in the analysis of whether *Scales* and *Miranda* should apply to the reading of the implied consent advisory. If refusal to test remains a crime, the argument is strong that both should.

If scoring a .10 or higher is retained with civil penalties, we need to consider strongly the combining of the hearing on the test with the DWI criminal trial. It would be a single proceeding. With a special verdict form, a properly instructed jury could easily sort out whether the defendant both scored .10 and was guilty of DWI, or was guilty of only one infraction but not the other, or not guilty of both. If the jury found both a .10 score and DWI, the trial court could impose both civil sanctions and criminal penalties, but they would have to run concurrently. If the jury found only a .10 score but not DWI, the trial court would impose only civil sanctions. If DWI only, but not a .10, the trial court would have the normal range of DWI criminal penalties.

Another option, if civil implied consent sanctions were retained for scoring a .10, would be to require the state to select the civil violation and try it to the court, or select the criminal DWI charge and go to a jury, or select the criminal DWI charge of scoring a .10 and go to a jury. Again, give the state the option of selecting one, but only one, and then rising or falling on those merits. There are legislative considerations inherent in this analysis, but there are judicial considerations inherent in this analysis as well. Due process, and state and federal constitutional guarantees of protection surround the gathering and presentation of evidence in implied consent issues when the state makes those issues indistinguishable from criminal issues.

Would applying a full *Scales* requirement and a full *Miranda* requirement to implied

consent proceedings, as long as the state wishes to keep refusal to test as a crime in our criminal code, be "soft on crime?" Would this be giving drinking drivers any break that other citizens accused of crimes do not get? I say absolutely not. I say the reverse is true. We are going to say to drinking drivers that the gloves are coming off, that we are going to treat you as criminals, and the rules of engagement are the Minnesota Rules of Criminal Procedure, the Minnesota Constitution, and the federal Constitution. Whether you like it or not, Mr. drinking driver, you are going to be required to accept your Fifth Amendment right to remain silent, your Fifth Amendment right not to be forced to give incriminating evidence against yourself, your right to a *Miranda* warning before custodial interrogation, and your right to have conversations preceding the implied consent advisory and the reading of the advisory itself imposed upon you. With this, I suggest, the crime of refusal to submit to testing perhaps has a chance to be honestly administered and enforced in this state, like theft, assault, and homicide. I suggest that without these safeguards, Minnesota is going to continue to flounder while trying to hold together untenable ends.

Let us examine the statute defining murder in the first degree and then draw a parallel back to the reading of the implied consent advisory, which as outlined above is an essential element of a crime itself, the crime of refusal to submit to testing. Assume a police officer reads out loud to a defendant the essential elements of Minn. Stat. § 609.185, subdivision 1 (1994):

Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

(1) Causes the death of a human being with premeditation and with intent to effect the death of the person or of another * * *.

Then assume the officer says to the defendant, "You have to admit or deny to me that you murdered the victim with premeditation. If you refuse to admit that or deny that, that is a crime in and of itself. If you admit that you did, that evidence will be used against you at trial (just like when you take a breath test after being scared into it by the implied consent advisory and you score a .10 or more)." The officer further says, "Even if you deny doing the murder and claim you are innocent (the parallel being the drinking driver denying that he was intoxicated—a common occurrence), you have to immediately submit to the giving of samples, such as blood, semen, body fluids, hair samples, and this will be done right on the spot, and that will be used against you at trial. You do have the limited right to call an attorney and ask him if you should do this, but if he says don't submit the samples, that is a crime in and of itself, and if he says you go ahead and submit the samples, they will be taken whether he can get down here in time or not and used against you at the trial."

If that were the scenario in Minnesota, I suggest the *Scales* recording requirement would religiously surround that entire episode at the place where the defendant was so questioned. It would be unthinkable to imagine otherwise.

Can we rationalize not using *Scales* in implied consent cases, but state that we would in first degree murder cases because those cases are more serious? I don't think we can make that analysis stick. *Scales* applies to the criminal side of DWI. The criminal side of implied consent is just as serious as the criminal side of DWI because the state has deliberately set the basic implied consent penalties just as severe or more severe than the basic DWI penalties. *See* Minn.Stat. § 169.121, subd. 3(b) (1994) (stating "[a] person who violates subdivision 1 [DWI] or 1a [refusal to submit to testing] * * * is guilty of a misdemeanor"). The state has done so in a conscious effort to encourage—read bludgeon—citizens who drive on Minnesota highways into taking a breath, blood, or urine test.

Our attempts so far to distinguish refusal to submit to testing from other crimes are not much help. *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), and *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), did not concern themselves with the State of Minnesota where the implied consent adviso-

ry itself forms an essential element of a crime carrying a severe penalty. The U.S. Supreme Court's handling of *Neville* and *Muniz* involves legal issues wherein consideration for Minnesota's crime of refusal to submit to testing was not even a blip on their radar screen.

The *Scales* requirement applies to custodial interrogation. Is the reading of the implied consent advisory custodial interrogation? The answer to custody is to try to walk out of the police station after you have been stopped on the highway, flunked a PBT or other roadside test, and have been brought down to the police station to take the breath test and face possible criminal charges. Is it interrogation? Well, if the crime is auto theft and if the officer asks you in a custodial situation if you stole the car, that question is interrogation and the defendant is entitled to be given the *Miranda* warning. The crime is theft and an essential element of theft is that you know you took the car without the consent of the person in lawful possession, or, as a lay person would put it, you stole it.

With the crime of refusal to submit to testing, the officer interrogates you after the advisory is read with the simple straight forward question, "Will you take a test?" If you answer "No," you have admitted to the crime of refusing to submit to testing. For myself, I do not know how to call that noninterrogation. At least, I would prefer to be on the side of the debate team that takes the affirmative of the proposition that with refusing to submit to testing now being a crime, in addition to leading to serious civil penalties, the direct question, "Will you take a test?" is as much criminal interrogation as the question "Did you steal the car?"

If we want to say that *Scales* applies to all other crimes but does not apply to implied consent refusal to submit to testing, then we should just "Nike it"—"just do it." The State of Minnesota has the power to declare that vanilla ice cream is the official ice cream of the State of Minnesota, but that chocolate ice cream is not. But it is not good public policy in explaining that decision to state, "After all, vanilla ice cream is real ice cream, but chocolate ice cream is not." To the

attorneys on both sides of a civil case, and to the attorneys on both sides of a criminal case, judicial logic is always on trial.

I note that courts have to struggle with sticky questions, hard questions, questions with political and public opinion overtones. Long ago, Minnesota courts came to realize that in certain situations, our state Constitution and the federal Constitution, from the viewpoint of law enforcement, are a messy and unfortunate roadblock to the investigation and apprehension of persons involved in theft, assault, homicide, and other serious crimes.

I guess we have learned to live with that.

I concur because the majority has correctly put the present state of the law. But I write separately because the present state of the law needs further examination.