**STATE of Minnesota, Respondent,**

v.

**Michael Jerome SCALES, Appellant.**

**No. C4–93–1541.**

Supreme Court of Minnesota.

June 30, 1994.

Rehearing Denied Aug. 22, 1994.

---

John M. Stuart, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, and Michael J. Scales, Stillwater, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Linda K. Freyer, Asst. County Atty., Minneapolis, for respondent.

## OPINION

WAHL, Justice.

Michael Jerome Scales appeals from a judgment of conviction, after a jury trial in a Hennepin County District Court, of two counts of first degree murder[1] and one count of second degree intentional murder[2] in connection with the stabbing death of Otha Brown. He was sentenced to life in prison.

The primary issue on appeal is whether appellant has a due process right under the Minnesota Constitution to have his entire interrogation by law enforcement authorities recorded or whether this court should exercise its supervisory powers to mandate such a requirement. Appellant also challenges the admission of three photographs and the trial court's instruction on reasonable doubt. In the exercise of our supervisory powers we mandate a recording requirement for all custodial interrogations. We affirm the conviction.

Otha Brown was the mother of Angela Walker, appellant's girlfriend, and the grandmother of Michael Scales, Jr., appellant's two-year-old son. Appellant, Angela, Angela's three children, including Michael Jr., and two of the Browns' other grandchildren lived with Otha and her husband Leon in Minneapolis. In spite of her poor health, Otha Brown raised her grandchildren, was active in her church, and was a school bus driver.

At approximately 1:00 a.m. on October 4, 1992, appellant walked into the Browns' bedroom, told Otha Brown that he was sick, and asked her to drive him to the hospital. Otha Brown agreed to drop appellant off at the hospital, threw a coat over her nightgown, and went out to her van. Leon Brown testified that appellant came back to the bedroom a few minutes later explaining that Otha Brown had forgotten her purse and had asked him to get it. After appellant left, Leon Brown went back to sleep but woke up around 2:00 or 3:00 a.m. and discovered that his wife had not returned and that Michael Jr. was missing.

Around 7:00 a.m., Otha Brown's body was found in an alley on Osseo Road. She had been stabbed 26 times with a single-edged knife. Two or three of the wounds could have caused Otha Brown's death. No weapons were found in the area where the body was discovered, but the police recovered a bloody "Emperor Steel" butcher knife and a bloody knit hat at a different location. The blood on the knife and the hat was consistent with Otha Brown's blood and the knife matched an "Emperor Steel" knife found in the Browns' kitchen.

Appellant's statements to the police and the testimony at trial established that during the early morning hours of October 4, appellant was at a crack house getting high and making drug runs in Otha Brown's van. Timothy Hill, an individual who accompanied appellant on one of these drug runs, testified that he noticed a red substance on the running board of the van. David Neal testified that while he was on a drug run with appellant, appellant mentioned that he had killed someone for money so he could repay people who were threatening to hurt him. While at the crack house, appellant handed out Otha Brown's checks and credit cards. Jeffrey Pearson, who received several of these items, testified that the plan was for him to purchase merchandise, sell it for cash, and share the proceeds with appellant. Appellant him-

---

1. Pursuant to Minn.Stat. §§ 609.185(1) and § 609.185(3).

2. Pursuant to Minn.Stat. § 609.19(1).

self made two unsuccessful attempts to use Otha Brown's bank card shortly after the time she was killed.

Otha Brown's van was found on October 5. Blood, consistent with Otha Brown's blood, was found throughout the van, but the greatest concentration was on the driver's door, the signal and shift levers, the driver's seat, the carpet, and the running board. Her purse was recovered in the vicinity where the van was found.

When appellant and his son returned home around 7:00 p.m. on October 4, the police placed him in a squad car and took him to the police station. Sergeant Michelle Smolley, Minneapolis Police Department homicide unit, and Special Agent Rick Loewen, a BCA investigator on loan to the Minneapolis police, began questioning appellant around 8:40 p.m. Both officers testified that before they questioned appellant, they gave him *Miranda* warnings. Appellant said he understood his rights, and indicated that he wished to waive them. The officers interrogated appellant for approximately three hours before conducting a formal question-and-answer statement that was simultaneously transcribed. No other part of the interview was recorded.

At the *Rasmussen* hearing, appellant disputed much of what the officers had said about the nature of the interview and the timing and content of the *Miranda* warnings. Appellant testified that he was not told he was under arrest or given any warnings until the interrogation was well underway, that when the warnings were given he was not asked if he understood his rights or was willing to waive them, that he was told, untruthfully, that his fingerprints had been found on the suspected murder weapon, and that he was "half liquored" and unable to use the bathroom during the interview. Appellant also denied giving several of the answers contained in the written statement and said that he was not permitted to read the statement before signing it. Appellant moved to suppress the formal statement and his other comments to police on the grounds that he had not received timely *Miranda* warnings, that the waiver of his rights was not explicit, and that neither the reading of his rights nor

his three-hour interview was recorded. The trial court, in denying the motion, declined to rule on whether there is a constitutionally based recording requirement.

At trial, Agent Loewen testified that appellant told two accounts of the events of October 4, 1992. In both versions, appellant said he and Otha Brown drove to the hospital and then decided to leave. When they returned home appellant, at Otha Brown's request, went inside to get her purse. He noticed that Michael Jr. was awake and brought him out to the van. Otha Brown then drove to a grocery store. At this point, the stories diverged. Initially, appellant said that Otha Brown dropped him off at the store after giving him $20, and he told the police he had not seen her since. He later changed his story and admitted to being "involved" in Otha Brown's death.

In a formal statement consistent with his second story, appellant said that while he was looking for his ID on the way to the hospital, he reached into the seat pocket and felt a knife. As in the first story, appellant said he returned to the house where he picked up Otha Brown's purse and his son. Consistent with the second story, however, appellant stated that when they reached the grocery store Otha Brown tried to give him more money than he wanted. He pushed her away while holding the knife in his hand and she fell to the floor of the van.

The next thing appellant remembered was driving away with bloody hands and throwing the knife out the window. When the officers asked appellant if he had blood on his sweatshirt, appellant said he did and admitted that it "most likely" was Otha Brown's blood. Forensic tests confirmed that the blood on appellant's clothes, shoe, wallet, players card, and pocket knife was consistent with the blood of Otha Brown. In addition, appellant's bloody fingerprints were found inside the van. He also had an abrasion on the inside of his thumb that was consistent with the use of a knife.

This appeal clearly focuses on whether there should be a recording requirement for custodial interrogations under either the Due Process Clause of the Minnesota Constitution

or the supervisory authority of this court. In previous cases, we have been concerned about the failure of law enforcement officers to record custodial interrogations. *State v. Robinson*, 427 N.W.2d 217, 224 (Minn.1988); *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991). In *Robinson* we observed that, as a practical matter, many factual disputes about the denial of a defendant's constitutional rights would be avoided if all conversations between the police and a suspect were recorded. 427 N.W.2d at 224 n. 5. More recently, in *Pilcher* we "urge[d] * * * law enforcement professionals [to] use those technological means at their disposal to fully preserve those conversations and events preceding the actual interrogation" and warned that we would "look with great disfavor upon any further refusal to heed these admonitions." 472 N.W.2d at 333. Appellant claims that by failing to preserve the entire interrogation, the police deliberately ignored our warning, thereby depriving him of his right to due process under the Minnesota Constitution.

The trial court distinguished *Robinson* and *Pilcher* on the grounds that the police conduct in those cases raised questions about an ambiguous or equivocal statement regarding the need for counsel, whereas in this case appellant does not allege that he asked for an attorney, failed to understand the *Miranda* warnings, or asked to terminate the interview. Although defense counsel raised the due process issue, the trial court declined to rule on whether appellant was deprived of a state constitutional right.

Appellant relies on *Stephan v. State*, 711 P.2d 1156 (Alaska 1985), which held that the unexcused failure to electronically record a custodial interrogation violated a suspect's right to due process under the Alaska Constitution. *Id.* at 1158. The Alaska Supreme Court found this constitutional right because law enforcement officials had failed to follow the rule it had established five years earlier: "it is incumbent upon [Alaska law enforce-ment officials] to tape record, where feasible, any questioning [of criminal suspects,] and particularly that which occurs in a place of detention." *Mallott v. State*, 608 P.2d 737, 743 n. 5 (Alaska 1980)

A recording requirement, the *Stephan* court stated, provides a more accurate record of a defendant's interrogation and thus will reduce the number of disputes over the validity of *Miranda* warnings and the voluntariness of purported waivers. *Stephan*, 711 P.2d at 1160–62. In addition, an accurate record makes it possible for a defendant to challenge misleading or false testimony and, at the same time, protects the state against meritless claims. Recognizing that the trial and appellant courts consistently credit the recollections of police officers regarding the events that take place in an unrecorded interview, the court held that recording "is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Id.* at 1159–60. A recording requirement also discourages unfair and psychologically coercive police tactics and thus results in more professional law enforcement.

Other courts have noted the protections that a recording requirement would provide but no state as yet has followed the *Stephan* decision.[3] Commentators have advocated a recording requirement. Yale Kamisar, *Brewer v. Williams: A Hard Look at a Discomfiting Record*, 66 Geo.L.J. 209 (1977–78); Glanville Williams, *The Authentication of Statements to the Police*, Crim.L.Rev. 6 (Jan. 1979). The Uniform Rule of Criminal Procedure 243 (1974) provides that information about rights, any waiver, and all questioning shall be recorded where feasible, and must be recorded when the questioning occurs at a place of detention. The Model Code of Pre–Arraignment Procedure § 130.-4(3) (1975) also contains a recording requirement.

---

3. *See People v. Raibon*, 843 P.2d 46, 49 (Colo. App.1992); *Commonwealth v. Fryar*, 414 Mass. 732, 610 N.E.2d 903, 909 n. 8 (1993); *State v. Buzzell* 617 A.2d 1016, 1018–19 (Me.1992); *Williams v. State*, 522 So.2d 201, 208 (Miss. 1988); *Jimenez v. State*, 105 Nev. 337, 775 P.2d 694, 696 (1989); *State v. James*, 858 P.2d 1012, 1017–18 (Utah App.1993); *State v. Spurgeon*, 63 Wash.App. 503, 820 P.2d 960, 961–63 (1991). *See also State v. Rhoades*, 119 Idaho 594, 809 P.2d 455, 462 (1991); *State v. Gorton*, 149 Vt. 602, 548 A.2d 419, 422 (1988).

The United States Supreme Court has not addressed the recording issue directly but even if custodial interrogations do not need to be recorded to satisfy the due process requirements of the Federal Constitution, we are not precluded from finding a recording requirement under the Minnesota Constitution. This court has "the power to provide broader individual rights under the Minnesota Constitution than are permitted under the United States Constitution." *State v. Murphy*, 380 N.W.2d 766, 770 (Minn.1986).

We are persuaded, as was the *Stephan* Court, that the recording of custodial interrogations "is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Stephan*, 711 P.2d at 1150–60. We are disturbed by the fact that law enforcement officials have ignored our warnings in *Pilcher* and *Robinson*. In *Stephan*, the state argued on behalf of the police department that the failure to record an entire interrogation was based on the "chilling effect" recordings had on a suspect's willingness to talk. 711 P.2d at 1162. Here, however, the state simply asserts that such a requirement is not constitutionally required and questions whether the requirement would, in fact, provide greater protections for defendants or make a substantial difference in police practices.

We choose not to determine at this time whether under the Due Process Clause of the Minnesota Constitution a criminal suspect has a right to have his or her custodial interrogation recorded. Rather, in the exercise of our supervisory power to insure the fair administration of justice,[4] we hold that all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention. If law enforcement officers fail to comply with this recording requirement, any statements the suspect makes in response to the interrogation may be suppressed at trial. The parameters of the exclusionary rule applied to evidence of statements obtained in violation of these requirements must be decided on a case-by-case basis. Following the approach recommended by the drafters of the Model Code of Pre-Arraignment Procedure, suppression will be required of any statements obtained in violation of the recording requirement if the violation is deemed "substantial." This determination is to be made by the trial court after considering all relevant circumstances bearing on substantiality, including those set forth in § 150.3(2) and (3) of the Model Code of Pre–Arraignment Procedure.[5] If the court finds a violation not to be substantial, it shall set forth its reason for such finding.

4. *See State v. Borst*, 278 Minn. 388, 397, 154 N.W.2d 888, 894 (1967).

5. Section 150.3(2) and (3) provide as follows:
(2) *Violations Deemed Substantial.* A violation shall in all cases be deemed substantial if one or more of the following paragraphs is applicable:
(a) The violation was gross, wilful and prejudicial to the accused. A violation shall be deemed wilful regardless of the good faith of the individual officer if it appears to be part of the practice of the law enforcement agency or was authorized by a high authority within it.
(b) The violation was of a kind likely to lead accused persons to misunderstand their position or legal rights and to have influenced the accused's decision to make the statement.
(c) The violation created a significant risk that an incriminating statement may have been untrue.
(3) *Circumstances to Be Considered in Determining Substantiality.* In determining whether a violation not covered by Subsection (2) is sub-

stantial, the court shall consider all the circumstances including:
(a) the extent of deviation from lawful conduct;
(b) the extent to which the violation was wilful;
(c) the extent to which the violation was likely to have led the defendant to misunderstand his position or his legal rights;
(d) the extent to which exclusion will tend to prevent violations of this Code;
(e) whether there is a generally effective system of administrative or other sanctions which makes it less important that exclusion be used to deter such violations;
(f) the extent to which the violation is likely to have influenced the defendant's decision to make the statement; and
(g) the extent to which the violation prejudiced the defendant's ability to support his motion, or to defend himself in the proceeding in which the statement is sought to be offered in evidence against him.

The rule and the remedy will apply prospectively from the date of the filing of this opinion. The Advisory Committee on Criminal Rules may further consider the issue of the proper scope of the exclusionary rule in this context.

■ Though the police in this case disregarded our prior warnings in *Robinson* and *Pilcher*, we affirm appellant's conviction because even if the unrecorded statements had been suppressed the result would have been the same. Appellant makes no claim that the unrecorded interrogation contained exculpatory evidence and the evidence against him without the statements was very strong.

On the night Otha Brown was killed, appellant convinced her to drive him to the hospital but there is no evidence in the record that they ever arrived at the hospital. Shortly after the time Otha Brown was killed appellant was photographed attempting to use her bank card and, according to several witnesses, appellant was at a crack house handing out Otha Brown's credit cards and checks with the understanding that he would receive a portion of any proceeds from their use. One of the witnesses who went on a drug run in Otha Brown's van after she was killed testified that he noticed a red substance on the running board where the police later found a substantial amount of Otha Brown's blood. Another witness testified that appellant mentioned that he had killed someone for money. When appellant was arrested, his clothes, shoes, and wallet were covered with Otha Brown's blood. Moreover, his bloody fingerprints were found in the van and the murder weapon matched a knife from the Browns' kitchen. In light of this evidence, any error in admitting the unrecorded statements was harmless.

■ Appellant also challenges the admission of three photographs—two of which showed Otha Brown with her grandchildren and one of which showed Otha Brown at Disney World with Mickey Mouse. The admission of photographs is a matter left to the discretion of the trial judge and will not be reversed absent a clear abuse of discretion. *State v. Friend,* 493 N.W.2d 540, 544 (Minn. 1992). Here, where the photographs were used to provide background information about the family and to personalize Otha Brown and where the number of photographs used for these purposes was small, the trial court did not err in admitting them.

■ Appellant makes a pro se challenge to the trial court's instruction that the jurors "should discuss the case with one another and deliberate with a view to reaching agreement if you can do so without violence to your individual judgment." Appellant claims that the term "violence" had a negative impact on the jury's understanding of reasonable doubt because it distorted the intensity a juror must feel before changing his or her mind. He also claims that it was error to give the instruction to a nondeadlocked jury. Neither argument is persuasive. First, the sentence appellant complains about is not an instruction on reasonable doubt, but is part of an instruction about the duty of the jurors to discuss the case and is taken directly from CRIMJIG 3.04 (Unanimous Verdict—Duty of Jurors to Discuss). Moreover, in *State v. Martin,* 297 Minn. 359, 371–72, 211 N.W.2d 765, 772 (1973), we specifically approved the language used in this instruction. We also approved of the instruction being given at the outset of deliberation, because "[t]he jury is forewarned of how it should proceed to forestall a deadlock" and because the "potential for coercion is minimized if the charge is simply reread at a time when the jury appears to be deadlocked." *Id.* Thus, the trial court did not err in instructing the jury.

We affirm the judgment of conviction.

Affirmed.

TOMLJANOVICH, Justice (concurring in part, and dissenting in part).

I agree with the majority that the conviction in this case be affirmed; however, I vigorously dissent from that portion of the majority's opinion holding that an unexcused failure to electronically record a statement during custodial interrogation must result in a suppression of that statement.

Custodial interrogations need not be recorded to satisfy the due process requirements of the United States Constitution relating to the preservation of evidence, as

established in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *see Stephan v. State,* 711 P.2d 1156 (Alaska 1985). Moreover, as the majority indicates, of all the states that have addressed this issue, only the Alaska Supreme Court has held that the unexcused failure to record a statement during custodial interrogation must result in suppression of the statement.[1] I am unwilling at this time to depart from the rule of the vast majority of courts in this country.

While the recording of statements is desirable in many respects, I am not persuaded that recording is essential to the adequate protection of the accused's right to a fair trial. I am especially reluctant to assume in the absence of any evidence that trial and appellate courts "consistently credit the recollections of police officers," slip opinion at 7, and thereby routinely abandon their obligation to fairly assess the credibility of witnesses.

An exclusionary rule is a drastic remedy. I believe such a drastic remedy should be applied only after a full hearing of all the policy implications and with adequate notice to law enforcement. *See State v. Spurgeon,* 63 Wash.App. 503, 820 P.2d 960, 963 (1991). This is particularly true where a right is not found to be rooted in the state constitution.

I would recommend the matter be referred to the Supreme Court Advisory Committee on Rules of Criminal Procedure for further consideration.

---

**1.** The Alaska Supreme Court did not rely on its supervisory powers but held that an exclusionary rule was necessary to protect a suspect's right to due process under the Alaska Constitution.