STATE of Minnesota, Respondent,

v.

**Carl James JARVIS, Appellant.**

No. C2–01–1097.

Court of Appeals of Minnesota.

Aug. 13, 2002.

---

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN; and Alan Mitchell, St. Louis County Attorney, Duluth, MN, for respondent.

John M. Stuart, State Public Defender, Marie Wolf, Assistant Public Defender, Minneapolis, MN, for appellant.

Considered and decided by TOUSSAINT, Chief Judge, RANDALL, Judge, and FORSBERG, Judge.*

## OPINION

R.A. RANDALL, Judge.

Appellant challenges his conviction for first-degree criminal sexual conduct, arguing that evidence is insufficient to support his conviction because the state used evidence that the victim had taken barbiturates, allegedly supplied by appellant, to prove two different elements of the offense. Appellant also argues that the district court should have suppressed his two statements made to the police because the interviews were custodial and should have been tape-recorded. Appellant also asserts that the prosecutor committed misconduct. We affirm.

## FACTS

Appellant and K.F. were employed at the same company and developed a friendship. In late 1998 or early 1999, appellant solicited K.F. to work in his division at the company. Before February 16, 1999, appellant and K.F. met three times at a hotel to discuss her potential promotion. The meetings would last a few hours. According to K.F., other employees were not informed about the meetings because appellant told her it must be kept quiet because it was a government program. Appellant paid for the hotel room and brought liquor and coffee to the room. K.F. testified that she never had a sexual relationship with appellant.

In late 1998 or early 1999, K.F. told appellant that she was becoming tired at work and that she thought she should take vitamins. Appellant agreed and began bringing vitamins in a plastic bag to work. K.F. regularly took the vitamins. At some point, K.F. told appellant about her dream to become a model. Appellant told K.F. that he had a friend in the modeling business who could assist her. On February 15, 1999, appellant told K.F. that he had talked to his connection in the modeling business and that K.F. needed to get a portfolio together. Appellant and K.F. planned to meet the next day at a hotel so appellant could photograph K.F. in her wedding dress, other dresses, and negligees.

K.F. testified that she arrived at the hotel at about 10:00 or 10:30 on the morning of February 16, 1999. She paid for the room with money appellant had given her the night before. Appellant offered K.F. coffee with liquor in it, and K.F. had one sip. At one point, appellant stated, [W]e better not forget to take our vitamins. Appellant took some pills out of a plastic bag and handed them to K.F., and K.F. took the pills. About ten minutes later, K.F. testified that appellant's words start[ed] to get long, the room start[ed] to get blurry. The last thing K.F. remembered that morning was listening to him talk and just hearing words being drawn out, the room just becoming like a glazed white. K.F. next remembered

> waking up to a click in the door and somebody coming in the room. * * * I

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

was on the bed with nothing but a shirt on under some covers. Hearing a click in the door, somebody walking in, not being able to move, and everything still being fuzzy and the room spinning and being very confused.

K.F. testified that she felt

[d]isorientated. I was laying down, so I tried to get up, and it was like you couldn't move your body. It was like you were just laying there trying to force yourself to get up; I couldn't. I still didn't know what was going on. I was still pretty groggy.

When she heard the door click, she looked to see who was at the door, and she saw appellant. Appellant then got into bed with K.F. and penetrated her. K.F. remembered that he ejaculated inside her, and she presumed that his semen would be found inside her because he did not use a condom.

K.F. stated she did not remember anything for a while again, and then she remembered being scared and wondering what's going to happen to me next. She got up, gathered her belongings, and went to her car. K.F. admits she was in no shape to drive, but because she had to get out of there, she drove her car. She stopped at a wayside rest stop. Later, two police officers and K.F.'s husband arrived. She told the officers she had been drugged and raped.

Afterward, K.F.'s husband brought her to a hospital. K.F. told the doctor she thought she had been drugged and raped. She thought she had been drugged because her motor functions were still slow and she remained disorientated. A nurse testified that K.F. was groggy, not really sure of events, had to be reminded of things frequently, and just * * * being somewhat bewildered about what was going on. The doctor testified that he initially believed she was possibly recovering from the influence of * * * barbiturates.

The doctor also testified that there was no evidence of trauma or injury to K.F.'s vaginal area but that K.F. told him she felt that she had had vaginal penetration. The doctor testified that K.F. stated that she ingested a beverage at about 10 a.m., became groggy, and did not remember anything until about 5 p.m. The doctor concluded that K.F. was amnesic for a six or seven hour period. At the hospital, K.F.'s blood was drawn. The lab tests revealed that K.F. did not have alcohol in her system.

At trial, the state showed K.F. photos of herself taken wearing various articles of clothing in the hotel room. K.F. recognized the hotel room but did not remember any of the photos being taken. K.F. had no recollection of ever consenting to sexual activity with appellant that day, and she stated that she never consented to any sexual activity with appellant at any time.

After the incident, an officer searched the hotel room and found an empty plastic bag but no pills. A sergeant executed a search warrant on February 19, 1999, at appellant's place of employment. After being informed that appellant had just left the restroom, the sergeant searched the men's restroom and found an unlabeled, empty, uncapped pill bottle in the trash container. After the search at his place of employment, appellant answered questions at the police station. Officers also searched appellant's workspace, home, and vehicle and found an assortment of pills. A forensic scientist from the Bureau of Criminal Apprehension (BCA) testified that the pills did not contain any barbiturates.

A second forensic scientist from BCA testified that K.F.'s blood sample taken at the hospital tested positive for the presence of two distinct barbiturate drugs, Amobarbital and Secobarbital. The forensic scientist testified that a barbiturate is a class of drugs that are known as sedative

hypnotic drugs. Secobarbital would induce a hypnotic effect that would put in a hypnotic type of sleep, not a normal sleep. The effect of the two drugs at lower concentrations would look like alcohol impairment, including slurred speech, stumbling, and divided attention. The forensic scientist further testified that sometimes the drugs are given as a preoperative medicine and sometimes people who have taken the drugs for this purpose do not remember their conversations. K.F.'s blood test revealed 3.4 milligrams of Amobarbital and 2.8 milligrams of Secobarbital in her blood, and the forensic scientist testified that this is a high level in the blood and that if a person was not accustomed to taking those drugs, the effects would be high to almost toxic.

The jury found appellant guilty of first-degree sexual conduct and use of drugs to facilitate a crime. This appeal followed.

## ISSUES

I. Was the evidence sufficient to sustain the jury's guilty verdict where the state used the same set of facts to establish the separate elements of physical helplessness and personal injury?

II. Did the district court err in refusing to suppress appellant's statements to the police?

III. Did the prosecution commit misconduct?

## ANALYSIS

### I.

### I. Sufficiency of the Evidence

◼ Appellant argues that the evidence is insufficient to sustain the jury's guilty verdict as a matter of law because the state used the same set of facts to establish two separate elements of first-degree sexual conduct, namely the elements of mental impairment or physical helplessness and personal injury.[1]

◼ An appellate court's review of a challenge to the sufficiency of evidence is limited to determining whether the evidence, viewed in the light most favorable to the conviction, supports the verdict. *State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989). A reviewing court recognizes that the jury is in the best position to evaluate the credibility of witnesses and assumes that the jurors believed the state's witnesses. *State v. Profit,* 591 N.W.2d 451, 467 (Minn.1999).

Under Minn.Stat. § 609.342, subd. 1 (1998), criminal sexual conduct in the first degree is defined as:

A person who engages in sexual penetration with another person * * * is guilty of criminal sexual conduct in the first degree if any of the following circumstances exists:

* * *

(e) the actor causes personal injury to the complainant, and either of the following circumstances exist:

* * *

(ii) the actor knows or has reason to know that the complainant is mentally impaired, mentally incapacitated, or physically helpless;

Thus, to obtain a conviction, the state needed to establish (1) appellant penetrat-

---

1. Appellant also asserts that the criminal sexual conduct statutes are vague and violate due process. The supreme court has rejected this argument. *State v. Reinke,* 343 N.W.2d 660, 662 (Minn.1984) (rejecting argument that there are vagueness and due process problems with the criminal sexual conduct statutes where defendant argued state failed to establish personal injury for first-degree sexual assault charge).

ed K.F.; (2) appellant caused K.F. personal injury; and (3) K.F. was mentally incapacitated or physically helpless. Appellant does not dispute that the elements of penetration or mental incapacity/physical helplessness were met. Instead, appellant asserts the evidence is insufficient to establish personal injury under Minn. Stat. § 609.342, subd. 1(e). We disagree.

■ Statutory construction is question of law reviewed de novo. *State v. Murphy*, 545 N.W.2d 909, 914 (Minn.1996). Under Minn.Stat. § 609.341, subd. 8 (1998), personal injury means bodily harm as defined in section 609.02. Bodily harm means physical pain or injury, illness, or any impairment of physical condition. Minn.Stat. § 609.02, subd. 7 (1998). Either pain or minimal injury would be sufficient to establish bodily harm under section 609.02 and therefore personal injury under section 609.341, subd. 8. *State v. Bowser*, 307 N.W.2d 778, 779 (Minn.1981).

Here, the doctor testified that after he decided not to obtain a rectal swab because K.F. denied any rectal pain, K.F. changed her mind because she felt some rectal pain. K.F. testified that she was disorientated, groggy, and could not get up or move her body. The officer who met with K.F. at the wayside testified that K.F.'s speech was slurred and her balance was so poor that the officer had to assist K.F. stand up and walk to the car. The doctor testified that he believed that K.F. was possibly recovering from the influence of * * * barbiturates and concluded that she was amnesic for a six or seven hour period. The doctor testified that although he did not know if K.F. lost consciousness, if she was unconscious, this would put [her] at risk of injury. The doctor further testified:

Q: Doctor, * * * [e]ven if maybe she did not lose consciousness totally, but take into consideration the barbiturates in her system to the point of suffering the amnesia that she told you about over a period of approximately six and a half hours, to a reasonable medical certainty, would you consider her to have suffered some type of impairment of her physical condition?

A: Yes. Yes, absolutely.

The forensic scientist testified that when the drug first becomes effective, it goes to the brain and gets chemically bound to some cell in the brain where it interferes with brain function. The scientist testified that if the barbiturates reach a toxic level in the blood stream, a person would become comatose and death can result and that if the drugs in K.F.'s system were ingested at 10:00 in the morning, they would definitely be in the toxic range at that time, and therefore, could have caused death.

■ Personal injury requires only a minimal amount of physical injury. *Bowser*, 307 N.W.2d at 779. In *Powe v. State*, this court found sufficient evidence to support personal injury where the victim experienced irritation in the vaginal area and pain in her lower stomach, and broke a thumbnail in attempting to prevent the assault. *Powe v. State*, 389 N.W.2d 215, 219 (Minn.App.1986), *review denied* (Minn. Jul. 31, 1986); *see also State v. Mattson*, 376 N.W.2d 413, 415 (Minn.1985) (concluding soreness and bruise on left breast resulting from the contact was sufficient to establish personal injury for first-degree sexual assault); *State v. Reynolds*, 386 N.W.2d 828, 830 (Minn.App.1986) (finding victim's bruised hand sufficient to establish personal injury). Here, the state has set forth sufficient evidence upon which the jury could conclude that K.F. suffered a personal injury. Because the evidence is sufficient for a jury to conclude that appellant drugged K.F. and that K.F. suffered a physical impairment as a result of the

defendant's action, we conclude the evidence is sufficient to establish personal injury for first-degree criminal sexual conduct.

 Appellant argues that the *same facts* used to establish mentally incapacity or physical helplessness cannot be used to establish personal injury. We disagree; this is not an issue of single behavioral incident or a single act. The single behavioral incident statute, Minn.Stat. § 609.035 (2000), protects criminal defendants from both multiple prosecutions and multiple sentences for offenses resulting from the same behavioral incident. *State v. Schmidt*, 612 N.W.2d 871, 876 (Minn.2000). The single act statute, Minn.Stat. § 609.04 (2000), bars the conviction of a defendant twice for the same offense against the same victim on the basis of the same act. *State v. Ture*, 353 N.W.2d 502, 517 (Minn. 1984). Sections 609.035 and 609.04 limit the state's ability to prosecute, sentence, or obtain a separate conviction for criminal acts that arise out of the same set of facts. This is not the issue before us. Here, we have the narrow issue of whether a series of acts leading to a victim's mental incapacity or physical helplessness can also be the same series of acts leading to personal injury.

We agree with appellant that the same series of acts was used to prove two elements. But appellant has cited no law that forbids a state from proving more than one essential element of a crime by using the same series of acts. We find no support in the law for appellant's contention. The same sequence of events can prove multiple elements of one crime. For instance, murder in the first degree requires the state to prove different elements, including premeditation to kill, intent to kill, and causing the death of a human being. Minn.Stat. § 609.185(1) (2000). Nothing prohibits the state from using the same series of acts to establish these elements. For example, while at a bar, a defendant pulls a pistol out of his belt and says to a man next to him with whom he was arguing, I am going to kill you. The defendant pulls the pistol up to shoulder level, aims it at the man, cocks the trigger, pulls the trigger, and kills the man. That is one series of acts. That same (one) series produces evidence that permits the state to argue the defendant (1) premeditated; (2) had intent to kill; and (3) killed a human being.

In other words, when the essential elements of a crime are multiple, as they always are, typically the single course of conduct the defendant follows may be used to fulfill each essential element. It is even possible that the same sequence of acts can prove two independent crimes for which a defendant can be prosecuted. If a burglar entered a dwelling with the intent to commit a crime and stole an item while inside, not only does that single course of conduct fulfill the multiple elements of burglary, but it also fulfills the definition of the independent crime of theft. *See* Minn.Stat. § 609.582, subd. 3 (2000) (defining burglary as entering a building without consent and with intent to steal); Minn. Stat. § 609.52, subd. 2(2) (2000) (defining theft as intentionally and without claim of right taking the movable property of another without the other's consent and with intent to deprive owner permanently of possession); *State v. Minton*, 276 Minn. 213, 215, 149 N.W.2d 384, 386 (1967) (stating crime of theft is not lesser included offense of burglary). We conclude that the same set of facts here used to establish mental incapacity or physical helplessness can also establish personal injury. We find the evidence is sufficient to sustain appellant's conviction.

## II. Suppression of statement

Appellant argues that the district court erred in denying his motion to suppress

his two statements to the police because (1) the interviews were custodial and were not recorded by police; and (2) even if the interviews were not custodial, the police should have recorded the interview because they occurred at places of detention and recording equipment was available.

In *State v. Scales*, the supreme court concluded that

all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention.

*State v. Scales*, 518 N.W.2d 587, 592 (1994). The district court may suppress any statements made during the off-the-record interrogation if the court finds that the violation of the recording requirement was substantial. *Id.* The determination of whether a violation was substantial is made on a case-by case basis considering all of the relevant circumstances. *Id.* Whether there was a substantial violation of *Scales* requirement is a legal question subject to de novo review. *State v. Critt*, 554 N.W.2d 93, 95 (Minn.App.1996), *review denied* (Minn. Nov. 20, 1996).

Appellant challenges two statements he gave to police. On February 19, 1999, an officer questioned appellant at the police department after officers had searched his place of employment. On February 26, 1999, appellant had his saliva, blood, and hair tested at a hospital pursuant to a search warrant, and appellant gave the officer who was present for the tests a statement in the officer's squad car. Appellant asserts that the interviews were custodial because (1) at the time of the interrogations the police had probable cause to believe a crime had taken place; (2) police had no other suspects; (3) the February 19, 1999, interview lasted three-hours and took place at a place of deten-

tion and occurred after four officers arrived at appellant's place of employment to conduct a search; (4) the February 26, 1999, interview in the squad car occurred at a place of detention; and (5) by not arresting appellant, police circumvented the *Scales* requirement. We disagree.

The determination of whether a suspect is in custody is an objective inquiry, and the district court must decide whether a reasonable person in the suspect's situation would have understood that he was in custody. *State v. Hince*, 540 N.W.2d 820, 823 (Minn.1995). An appellate court independently reviews the district court's determination regarding custody. *Id.*

At the omnibus hearing, the officer who questioned appellant at the police department on February 19, 1999, testified that she explained to appellant that appellant was not under arrest and was under no obligation to speak to him and that appellant said that he was more than willing to come down to talk. In her report, she writes, I explained to [appellant] this would be of his own free will and he was not under arrest, nor would I detain him in anyway, and at any time if he wished to leave, all he had to do was say so. A second officer, who was present on February 26, 1999, when appellant had his saliva, blood, and hair tested pursuant to a search warrant, testified that appellant initiated contact to discuss the case and that the officer told him he should consult his attorney first. A complaint was not filed against appellant until April 26, 2000, more than a year after his statements to the police.

The officers' testimony establishes that on February 19 and February 26, appellant was free to leave and not answer police questions and that on February 26, appellant initiated the contact. We con-

clude that a reasonable person in appellant's situation would have understood that he was not in custody, and, thus, the interviews were not custodial and not subject to the *Scales* recording requirement. Appellant argues that the officers attempted to circumvent the *Scales* requirement. However, more than a year passed between the time appellant gave his statements and the complaint was filed. On this record, there is no evidence that the officers intentionally attempted to circumvent *Scales*.

 Appellant also asserts that even if the interviews were not custodial, the officers should have recorded the interviews because they occurred at a place of detention and recording equipment was available. Appellant asks this court to extend *Scales* to noncustodial interrogation occurring at a place of detention when electronically feasible.

 The supreme court's decision in *Scales* was not based on either the Federal or the Minnesota Constitution. *Scales*, 518 N.W.2d at 592. The purpose of the recording requirement is to avoid factual disputes about a suspect's claim that police officers violated his rights. *Id.* at 591 (citation omitted); *see also State v. Miller*, 573 N.W.2d 661, 674 (Minn.1998) (reiterating rationale for *Scales* decision was to prevent factual disputes about existence and context of *Miranda* warnings and any ensuing waiver of rights). In *State v. Thaggard*, 527 N.W.2d 804, 807–08 (Minn. 1995), the supreme court held that the primary purpose of the recording requirement was not to help the criminal defendants or the state but to assist the court in the resolution of evidentiary disputes and in more accurately determining the underlying facts. Here, appellant is not claiming that the officers did not give him a *Miranda* warning or otherwise failed to procure a waiver of his rights. Rather, appellant argues that because no recording

was made, and because the police officers' testified to statements made by appellant that were inconsistent with appellant's testimony at trial, the jury questioned appellant's credibility. We understand the argument. But using a recording solely for the purpose of bolstering a (noncustodial) defendant's credibility is not, at least yet, mandated by *Scales*. We decline to extend *Scales* to these circumstances. The district court did not err in denying appellant motion to suppress the statements.

## III. Prosecutorial Misconduct

 Appellant argues in his pro se brief that the prosecutor committed misconduct by introducing into evidence a pill bottle found in the bathroom of appellant's place of employment and stating in closing arguments that the parties stipulated that the police fingerprinted the bottle and found no prints. Appellant asserts that he did not intend to enter into such a stipulation and that he has the right not to stipulate to any evidence.

 A district court's denial of a new trial motion based on alleged prosecutorial misconduct will be reversed only when the misconduct, considered in the context of the trial as a whole, was so serious and prejudicial that the defendant's constitutional right to a fair trial was impaired. *State v. Johnson*, 616 N.W.2d 720, 727–28 (Minn.2000) (citations omitted). In cases involving less serious prosecutorial misconduct, the test is whether the misconduct likely played a substantial part in influencing the jury to convict. *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974).

The record shows that appellant did not stipulate that the container was fingerprinted:

STATE: Your Honor, we'll stipulate that this was checked, and there are no

finger—there were no fingerprints found on this item.

DEFENSE: Well, I—I'm not going to stipulate. I don't have any—if he wants to introduce it into evidence, I can—

STATE: I'll offer—

DEFENSE:—I am not going to object to that.

In closing arguments, the defense argued that the police did not properly investigate the allegation against appellant, by pointing out, among other things, that the police failed to fingerprint the pill container. During the state's rebuttal, appellant objected when the prosecutor argued that the parties stipulated that no prints were found on the container:

> [W]hat do we find in the bathroom? An empty pill container. Did you find the drug in it? No. His fingerprints on it? No.

The prosecutor apparently misconstrued appellant's statement that I am not going to object to that to mean that he withdrew his objection to the stipulation that the container contained no fingerprints. But appellant's counsel only stated he would not object to admission of the pill bottle into evidence. However, we conclude that the prosecutor's misinterpretation and resulting comment in closing argument does not rise to the level of serious prosecutorial misconduct. We find no evidence of bad faith on the part of the prosecutor.

When considering the trial as a whole, the misconduct was not so prejudicial that appellant's constitutional right to a fair trial was impaired. The administration of justice does not mandate a new trial on these facts. The pill bottle was unlabeled, empty, and found in a restroom used by many employees. The absence of fingerprints on the container could support that the pill container did not belong to appellant. Officers found an assortment of pills in appellant's home, vehicle, and place of employment. Appellant admitted he provided K.F. with vitamins at work prior to the day of the incident. In light of the substantial evidence that appellant possessed a various assortment of pills, whether or not appellant's fingerprints appeared on the pill container (and thus whether or not appellant stipulated to this fact) would not have played a substantial part in influencing the jury to convict. *See State v. Bonn*, 412 N.W.2d 28, 30 (Minn. App.1987) (concluding defendant was not denied right to fair trial where prosecutor's remarks were inadvertent, the prejudicial impact was speculative and minimal, and the evidence implicating the defendant was overwhelming), *review denied* (Minn. Oct. 21, 1987). We conclude the district court did not err by denying appellant's motion for new trial based on prosecutorial misconduct.

## DECISION

The evidence is sufficient to sustain appellant's conviction for first-degree criminal sexual conduct. Different facts and/or the same facts can be used by the state to prove more than one essential element of a criminal act.

The officers did not violate the Scales recording requirement. We decline to extend *Scales* to the circumstances of this case.

The prosecutor did not commit serious misconduct. Appellant's constitutional right to a fair trial was not impaired.

**Affirmed.**