**STATE of Minnesota, Respondent,**

v.

**Carl James JARVIS, Petitioner, Appellant.**

No. C2–01–1097.

Supreme Court of Minnesota.

July 24, 2003.

Rehearing Denied Aug. 27, 2003.

Marie Wolf, Asst. State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Asst. Attorney General, St. Paul, MN, Alan L. Mitchell, St. Louis County Attorney, Duluth, MN, for Respondent.

### OPINION

MEYER, Justice.

Appellant Carl James Jarvis was convicted on three counts of first-degree criminal sexual conduct and one count of use of drugs to facilitate a crime for allegedly drugging and repeatedly raping his victim. The court of appeals affirmed his convictions. This appeal followed.

Jarvis argues that his conviction for first-degree criminal sexual conduct was unsupported by the evidence because causing someone to lose consciousness is not sufficient to establish that he caused a personal injury under Minn.Stat. § 609.342, subd. 1(e)(ii) (2002). Jarvis also argues that the district court erred when it admitted into evidence an interview he gave to the police because the interview should have been recorded. We affirm the district court.

Jarvis and K.F. were employed at the same company and over the course of time they became friends. K.F. testified that Jarvis was someone she confided in about work, family, friends, and even problems in her marriage. In late 1998 or early 1999, Jarvis asked K.F. to work for his division at the company. They met on three separate occasions at a hotel to discuss the potential promotion. K.F. testified that none of these meetings resulted in any type of sexual conduct.

Around this same time, K.F. complained to Jarvis about feeling tired at work. Jarvis agreed that K.F. should take vitamins and began bringing vitamins in a plastic bag to work. K.F. took the vitamins provided by Jarvis without any adverse effect.

In the course of their friendship, K.F. confided in Jarvis that her goal was to become a model. Jarvis offered to make connections for K.F. with a so-called "friend" in the modeling business to further K.F.'s goal. On February 15, 1999, Jarvis told K.F. that his contact in the modeling industry requested K.F.'s portfolio. They agreed to meet the next day at a hotel so Jarvis could photograph K.F. in various outfits.

As agreed, K.F. met Jarvis at a hotel on February 16 at about 10:00 or 10:30 a.m. Before K.F. went into the bathroom to change, Jarvis stated "[w]e better not forget to take our vitamins," and handed her a handful of pills. K.F. took the pills. She testified that the pills looked no different from the vitamins Jarvis had given her in the past. About ten minutes later, K.F. testified that Jarvis's words began to get long, the room started to get blurry, and the last thing she remembered was the room becoming white.

K.F. testified that her next memory was hearing a door click and the sound of someone entering the room. She was "on the bed with nothing but a shirt on under some covers." She testified that she felt

> [d]isoriented. I was laying down, so I tried to get up, and it was like you couldn't move your body. It was like you were just laying there trying to force yourself to get up; I couldn't. I was confused. I still didn't know what was going on. I was still pretty groggy.

She also testified that Jarvis got into bed with her and sexually penetrated her. She was amnesiac again for an unknown period of time. Eventually she was able to get up, collect her belongings, and leave the hotel. She started to drive home.

She called her husband and told him that she had been drugged and raped and could not drive, and stopped at a weigh station to wait for him. Officer Eric Flood arrived at the weigh station at 5:30 p.m. and observed K.F. as being very confused, with slurred speech. Flood testified that K.F. appeared to be drunk and could hardly stand or move on her own.

K.F. was admitted to St. Mary's Hospital at 6:55 p.m. where she was examined by Dr. Daniel Campbell and nurse Kathryn Fast. Fast observed K.F. as being groggy, unsure of any events, and bewildered. Campbell testified that he believed K.F. had recently ingested barbiturates and concluded that she was amnesiac for six to seven hours during the day. Campbell's conclusion was confirmed by a test result indicating the presence of barbiturates in K.F.'s urine. He also testified that there was no other evidence that she was injured or had suffered trauma as a result of the rape. Dr. Campbell concluded to a reasonable degree of medical certainty that loss of consciousness from barbiturates is an impairment of a physical condition.

LaRae McPartlin, a forensic scientist from the Bureau of Criminal Apprehension, testified that K.F.'s blood sample taken at the hospital tested positive for the presence of two distinct barbiturate drugs, amobarbital and secobarbital. Both of these drugs are sedative hypnotic drugs and are used to put people to sleep. McPartlin testified that when secobarbital becomes effective, it binds to cells in the brain and interferes with brain function. She further testified that if taken at a therapeutic level the barbiturates cause "divided attention impairment which would influence a person's driving, * * * influenc[e] the person's gait. [The individual] would appear to sort of stumble, incoherent." If the amount of barbiturate ingested reaches a toxic level, the individual may lose consciousness, become comatose, or even die. The amount of barbiturates in the blood sample drawn from K.F. at approximately 9:00 p.m. on February 16, 1999, was "high to actually almost toxic." McPartlin testified that if K.F. ingested the barbiturates at 10:00 a.m., during K.F.'s amnesiac period the amount of barbiturates in her system would have been even higher and "into the toxic range."

Jarvis testified on his own behalf and claimed that K.F. was the aggressor and the sex that occurred on the date in question was initiated by K.F. He denied drugging her.

Prior to trial, a suppression hearing was held to determine the admissibility of an officer's summary of an interview Jarvis had with the police. The interview occurred on February 19, 1999, when four Duluth police officers went to Jarvis's workplace to investigate the incident. After one of the officers explained that Jarvis was not under arrest and had no obligation to speak to the police, Jarvis agreed to accompany the officer to the police department and give an interview. The officer questioned Jarvis at the Duluth Police Department, first in an interview room and later in an office, but did not record the interview. Nor was Jarvis given a *Miranda* warning. Jarvis was not arrested that day and, in fact, a summons was not issued for another year.

The officer testified at the omnibus hearing that at no time during the February 19 interview did Jarvis communicate a desire to end the questioning or invoke his right to counsel. The officer also testified that the policy of the Duluth Police Department is not to record noncustodial interviews. Jarvis did not testify at the omnibus hearing. The district court denied Jarvis's motion to suppress the interview with the police, ruling that it was

noncustodial and, therefore, need not be recorded.

Jarvis appealed his conviction to the court of appeals on three grounds. He first contended that there was insufficient evidence to support his conviction because the state used the evidence that he had given the victim barbiturates to prove two different elements of the offense. *See State v. Jarvis,* 649 N.W.2d 186, 189 (Minn.App.2002). His second contention was that the district court should have suppressed his interview with the police because it should have been tape-recorded since it was custodial or, if not custodial, the interview was made in a place of detention where recording equipment was available. *Id.* Finally, Jarvis argued that he should receive a new trial because the prosecutor had committed serious misconduct. *Id.* The court of appeals affirmed, concluding that there was sufficient evidence to sustain the verdict, there was no requirement under *State v. Scales,* 518 N.W.2d 587 (Minn.1994), to record a noncustodial interview, and the prosecutor did not commit serious misconduct warranting a new trial. *Id.* at 196. Jarvis appealed, questioning the sufficiency of the evidence supporting his conviction and whether his interview should have been admitted. We granted review.

On an appeal on grounds of sufficiency of evidence, we view the evidence in favor of the state and assume that the jury believed all the state's witnesses and disbelieved any evidence to the contrary. *State v. Thames,* 599 N.W.2d 122, 126–27 (Minn.1999). As such, the defendant bears a heavy burden to overturn a jury verdict.

*State v. Vick,* 632 N.W.2d 676, 690 (Minn. 2001).

Jarvis argues his conviction should be reversed because the evidence at trial did not support all three statutory elements of first-degree criminal sexual conduct. Under Minn.Stat. § 609.342, subd. 1(e), an individual is guilty of criminal sexual conduct in the first degree if a person "engages in sexual penetration with another person" and "causes personal injury to [another], and either of the following circumstances exist: (i) the actor uses force or coercion to accomplish sexual penetration; or (ii) the actor knows or has reason to know that [the victim] is mentally impaired, mentally incapacitated, or physically helpless." Jarvis does not dispute the sufficiency of the evidence to establish the elements of sexual penetration or mental incapacity/physical helplessness. Rather, he asserts that the evidence is insufficient to establish "personal injury" under Minn.Stat. § 609.342, subd. 1(e).[1]

"Personal injury" is defined as bodily harm, severe mental anguish, or pregnancy. Minn.Stat. § 609.341, subd. 8 (2002). "Bodily harm" is further defined as any "physical pain or injury, illness, or *any impairment of physical condition.*" Minn. Stat. § 609.02, subd. 7 (2002) (emphasis added). We have not had occasion to address the type of evidence needed to support a finding of an "impairment of physical condition" as a type of bodily harm.

When interpreting a statute, the "words and phrases are construed according to the rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08 (2002). When the

---

1. Jarvis also initially argued that the evidence was insufficient to sustain his conviction because evidence that he drugged K.F. could not be used to prove both the element of knowledge that K.F. was "mentally impaired, mentally incapacitated, or physically helpless" and the element of causing "personal injury." He abandoned this position at oral argument.

language is clear and unambiguous, we apply the plain meaning of the statute and must not engage in any further statutory construction. *State v. Wukawitz*, 662 N.W.2d 517, 525 (Minn.2003). "Impair" is defined as "to make or cause to become worse; diminish in ability, value, excellence, etc.; weaken or damage." *Random House Webster's Unabridged Dictionary* 959 (Wendalyn R. Nichols & Sheryl B. Stebbins eds., 2d ed. 2001). Therefore, according to its common usage and plain meaning, we conclude that the phrase "any impairment of physical condition" in Minn.Stat. § 609.02, subd. 7, means any injury that weakens or damages an individual's physical condition.

■ The evidence amply supports the state's claim that K.F.'s physical condition was weakened or damaged by an involuntary ingestion of drugs. Various individuals testified that after her meeting with Jarvis, K.F. was disoriented and groggy and could not get up or move her body without assistance. K.F. testified that she was amnesiac for a period of hours after taking the "vitamins" given to her by Jarvis. When she tried to get up from the bed before Jarvis sexually penetrated her, she was unable to move her body. The scientific evidence established that K.F. had ingested a potentially toxic amount of barbiturates capable of causing slurred speech, divided attention impairment, and impaired gait. Assuming the jury believed all the state's witnesses and disbelieved any evidence to the contrary, K.F. involuntarily ingested a toxic amount of barbiturates that weakened or damaged her ability to move, remember, speak, drive, and generally function in a normal way. Under these facts we conclude that K.F.'s physical condition was sufficiently impaired by the ingestion of drugs as to satisfy the definition of bodily harm under Minn.Stat. § 609.02, subd. 7.

Our conclusion is consistent with cases in which we have examined the amount of physical pain or injury needed to support a finding of bodily harm under Minn.Stat. § 609.02, subd. 7. *See State v. Johnson*, 277 Minn. 230, 237, 152 N.W.2d 768, 773 (1967) (concluding that there was sufficient evidence to constitute "bodily harm" when the victim experienced pain from being struck); *see also State v. Mattson*, 376 N.W.2d 413, 415 (Minn.1985) (finding sufficient evidence of physical injury based on a bruise); *State v. Bowser*, 307 N.W.2d 778, 779 (Minn.1981) (concluding that sufficient evidence of personal injury existed when the victim felt considerable pain with sexual penetration and based on a laceration that resulted in bleeding). In the instant case, the evidence of impairment of physical condition exceeds the minimal amount of physical pain or injury we have found to satisfy the definition of "bodily harm" under Minn.Stat. § 609.02, subd. 7. Accordingly, we hold that the state presented sufficient evidence of bodily harm to establish personal injury under Minn. Stat. § 609.342, subd. 1(e).

■ Jarvis's second contention is that the district court erred in admitting the police officer's summary of the interview he gave in February of 1999. He argues this interview was important because, although it did not contain any admission of guilt, the interview was inconsistent with later statements by Jarvis, giving the jury reason to disbelieve his version of events. Although Jarvis argued at trial and before the court of appeals that the interview was given in a custodial setting, he now concedes that the interview was noncustodial and "asks this court to extend the holding of *State v. Scales*, 518 N.W.2d 587 (Minn. 1994), to require recording of all interrogation at a place of detention, regardless of whether the interrogation is 'custodial.'" We exercise de novo review of whether to

extend the recording requirement. *State v. Conger*, 652 N.W.2d 704, 706 (Minn. 2002).

We recently refused an invitation to extend *Scales* to noncustodial interrogations at police stations. *Id.* The *Conger* case involved a suspect who agreed to be interviewed at the police station in connection with a criminal sexual conduct investigation. *See id.* at 706. We concluded that "while many of the benefits of recording custodial interrogations would accrue to noncustodial interrogations, the interests of justice do not require that police record all noncustodial interrogations at this time." *Id.* at 709. Jarvis presents no persuasive argument for extending recording to noncustodial interrogations; therefore, we decline to reconsider our decision in *Conger* and conclude the district court did not err when it admitted into evidence Jarvis's interview.

Affirmed.