2023 UT App 4

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GARY JOSEPH GRAYDON,
Appellant.

Opinion
No. 20190918-CA
Filed January 20, 2023

Third District Court, West Jordan Department
The Honorable Chelsea Koch
The Honorable Katie Bernards-Goodman
No. 171404075

Janet Lawrence and Steffen Soller,
Attorneys for Appellant

Sean D. Reyes and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER and SENIOR JUDGE
KATE APPLEBY concurred.[1]

TENNEY, Judge:

¶1      A jury convicted Gary Graydon of aggravated assault and reckless driving after he displayed a gun during a road rage incident. On appeal, Graydon argues that there was insufficient evidence to support his conviction for aggravated assault, that the district court should have declared a mistrial after a police officer testified that Graydon had been in "a similar situation" before,

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

and that the district court should have suppressed the victim's identification of him. For the reasons set forth below, we affirm.

BACKGROUND[2]

*Wife's 911 Call*

¶2 Around 8:30 p.m. on August 5, 2017, Graydon's wife (Wife) called 911 and told the dispatcher that Graydon was suicidal and had just left their home in Riverton, Utah, with a handgun. Wife also reported that Graydon was driving a "goldish/brown" 2000 Lexus RX 350. An officer with the Unified Police Department (Officer 1) responded to the call and interviewed Wife.

*The Incident*

¶3 Sometime within the next twenty minutes or so, the victim (Victim) was driving north on Highland Drive in Draper, Utah. A vehicle "pulled out in front of [him] and there wasn't much room at all, so [he] hit [his] brakes and slowed down." Victim later recalled that the vehicle was a "silverish-blue" Lexus and that it was a "small SUV" model, like "an RX350." After pulling in front of Victim, the Lexus driver "slammed" on the brakes and "came to a complete stop." When the Lexus didn't move, Victim drove around it, and he could see the Lexus driver yelling and shaking his fist at Victim. Victim later identified the Lexus driver as Graydon.

¶4 "[A]bout five seconds later," Graydon came "whizzing" past Victim, slammed on his brakes, and then started "swerving

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

back and forth." Victim decided to pull over to the side of the road because he thought Graydon would just keep going. After Victim pulled over, other vehicles followed suit and parked behind him.

¶5     But Graydon did not keep going. Instead, he pulled to the side of the road about 30 feet in front of Victim, got out of his vehicle, and came running back towards Victim. Victim got out of his truck too. At trial, when asked why he exited his vehicle, Victim explained that his truck was new and he was worried that Graydon would damage it. Graydon met Victim at Victim's driver-side door, said, "Let's go," and kicked Victim in the side at about rib height. Victim was able to mostly block the kick with his elbow. Graydon then swung at Victim with his fist, but he missed. Victim swung back at Graydon, hitting him and knocking him to the ground. Victim hit Graydon "probably" "two, three more times" because he was afraid that if he "let [Graydon] up for a second," Graydon would "swing" or "kick" at Victim again. When Graydon said, "I've had enough," Victim stopped swinging.

¶6     The two men returned to their respective vehicles, and because the fight had happened near Victim's truck, Victim arrived at his first. When Victim got to his door, he "stood there for just a second" and watched Graydon to make sure that Graydon didn't "run back" at him. Victim then got into his truck when Graydon reached his Lexus. But Graydon didn't get into his vehicle— instead, he leaned in and pulled out "a silver pistol." Graydon then stood by his door and tried to "rack a round" by pulling the slide "at least six or seven times," but it "looked like it was jammed." As Graydon did this, he didn't "draw a bead on" Victim, but the gun "was pointing towards [Victim at] about a 45-degree angle in [his] general direction."

¶7     Victim was frightened and wanted to drive away, but he could back up only a few feet because a vehicle was parked behind him. He was also afraid that Graydon would shoot him if he pulled forward. So Victim "froze like a deer in the headlights

for a second." After the unsuccessful attempts to chamber a round, Graydon threw the gun into his Lexus and "sped off."

¶8      Victim pulled out and drove behind Graydon, "hoping to follow him long enough that the cops could catch him." But Graydon was driving "erratically," so after "about a half a mile," Victim pulled over and called 911.

*The Investigation and Preliminary Hearing*

¶9      At 8:44 p.m., an officer from the Draper City Police Department (Officer 2) responded to Victim's 911 call. Victim and Officer 2 met just off Highland Drive, and Officer 2 observed that Victim "was in somewhat of a panic or looked stressed." Victim described what had happened, and Officer 2's body camera captured at least some of Victim's description.[3]

¶10      After talking with Victim, the police identified Graydon as a suspect in the case because Victim's description of the driver and vehicle from his confrontation mostly matched the description of Graydon and his vehicle that Wife had given to officers earlier. Sometime within an hour of the incident, an officer presented Victim with a photograph lineup that included a headshot of Graydon. Victim was unable to identify Graydon from the lineup, however, because in his opinion, "the pictures were not good to go off of."

¶11      The State later charged Graydon with aggravated assault and reckless driving. About four to six weeks after the incident,

---

3. The record contains four accounts from Victim about the incident: a transcript of the portion of the bodycam footage described above that was later played at trial; Victim's preliminary hearing testimony; Victim's testimony at the hearing on the motion to suppress; and Victim's testimony at trial. As explained below, the accounts have some inconsistencies, but we don't consider those inconsistencies to be material.

Victim received a notice about the upcoming preliminary hearing, saw Graydon listed as the defendant, and looked up his Facebook page. When looking at some of Graydon's photos, Victim became "absolutely 100 percent" certain that Graydon was the driver from the confrontation. At the preliminary hearing (which occurred about seven months after the incident), Victim described what happened and identified Graydon as the driver. He also acknowledged that he had looked at Graydon's Facebook page before the hearing.

*Graydon's Motion to Suppress*

¶12　After the preliminary hearing, Graydon filed a motion to suppress Victim's eyewitness identification. Graydon contended that the identification was "unconstitutionally unreliable," and he based his argument on the factors laid out in *State v. Ramirez*, 817 P.2d 774 (Utah 1991). For example, he argued that although Victim had the "opportunity to observe the unknown individual during the event," Victim was likely more focused on the fight than on identifying the other man and "that the stress from the fight caused him to be distracted and not focused." Graydon also argued that Victim's identification "was influenced by his own independent research" and that Victim "may have simply identified the man he searched for online after being given the name of the individual by the State." Graydon accordingly argued that Victim's identification was "unreliable and should be excluded at trial."

¶13　The district court held a hearing on Graydon's motion to suppress. Victim was the only witness, and he testified to the events described above. Relevant to Graydon's motion, Victim testified that on the day of the incident, he had not consumed any drugs or alcohol, he was wearing his contacts and could see clearly, it was "[v]ery light" outside, and the other driver's face was not covered. Victim described the other driver as being "about" his height with a muscular build, and he said that the driver was either barefoot or wearing flip-flops. He also said the

Lexus was either an RX350 or an RX330, that it was "maybe 10 years old," and that it was "[s]ilver with maybe a little bit of blue to it." He said that he saw the Lexus in the parking lot at the preliminary hearing. And although Victim admitted that he was unable to identify Graydon at the earlier photo lineup, he said that he was "absolutely 100 percent" certain that Graydon was the driver after looking at Graydon's Facebook page.

¶14 After argument from both sides, the court denied Graydon's motion to suppress. In doing so, the court found that Victim "had sufficient opportunity to observe the person assaulting him for 20–30 seconds at close range," that "it was light outside," that Victim's "attention was completely on the person assaulting him," that Victim "was wearing contacts[,] giving him clear vision," and that Victim "was not on any substances that would impair his vision or mental acuity." The court also concluded that "looking up photos on Facebook is no more suggestive than coming to a court hearing and seeing the Defendant sitting next to his attorney." The court thus held that the "identification made by [Victim] by looking up photos of [Graydon] on Facebook [was] sufficiently reliable for admission and consideration by a jury." But the court also ruled that Graydon could "discuss the suggestive event with the jury," "have an expert," and cross-examine Victim "to try and damage the weight of the identification."

*The Trial*

¶15 At trial, the State presented four witnesses: Victim, the 911 dispatcher (Dispatcher) who answered Wife's call, Officer 2, and Officer 1.

¶16 Victim testified to the events as described above. On cross-examination, trial counsel (Counsel) asked Victim about the photo lineup and the Facebook search. Victim confirmed that he was unable to pick Graydon out of the lineup and that he was only able to identify him after viewing his Facebook page. Counsel also

questioned Victim about the inconsistencies among his four accounts of the incident.

¶17 Officer 2 testified next, and on cross-examination, Counsel played bodycam footage of the officer's interview of Victim. Counsel also questioned Officer 2 about Victim's inability to identify Graydon in the photo lineup.

¶18 Dispatcher and Officer 1 each testified about Wife's 911 call. Officer 1 explained that he had at some point become aware of a road rage incident involving a vehicle and driver that matched Wife's description of Graydon. The prosecutor asked if he found "out any more information about" Graydon, and Officer 1 responded "[t]hat there was a similar situation several years earlier." Counsel objected to this statement, but before the court could rule, the prosecutor reworded his question and asked whether the police ever located Graydon.

¶19 After Officer 1 finished testifying, and outside the jury's presence, Counsel asked for a mistrial based on Officer 1's statement "[t]hat there was a similar situation several years earlier." The court accessed Graydon's criminal history and saw that he had no prior assault convictions or road rage incidents. But the court declined to grant a mistrial and instead gave the jury the following curative instruction:

> You heard an officer—you heard an objection when an officer said something about a prior incident or a prior similar incident. So we just waited to the break to look into it. I want to instruct you that there is no prior similar incident. The defendant does not have a prior road rage. He does not have any prior aggravated assaults. So we don't know what that was. The officer could have been looking up something and it could have been somebody else's.

> So you need to decide this case on the evidence you hear today with this incident and not try to consider anything from the past.

¶20 After the State presented its case in chief, Counsel moved for a directed verdict based on several grounds. First, he argued that Victim's identification of Graydon was tainted because of Victim's "research through Facebook." Second, he asked the court to "strike" and "disregard" Victim's testimony because Victim made "himself out to be extremely innocent," which was "not believable." Third, Counsel argued that the case wasn't "true to aggravated assault" because there were "indications" that Victim initiated the fight, that Victim "beat [Graydon] up," and that Graydon was just "playing with his gun" and "was not pointing it at" Victim.

¶21 The district court denied the directed verdict motion. The court understood Counsel to be arguing, in part, that Victim's various accounts of the incident were too inconsistent to support a conviction. And the court acknowledged that there were some inconsistencies among Victim's four accounts of the incident. Among others, Victim was inconsistent about whether he honked at Graydon, how close the two vehicles were when Graydon pulled in front of Victim, and whether Victim had called Graydon a "paper dragon."[4] But the court explained that despite these or any other inconsistencies, there were no inconsistencies in Victim's account about "who started the fight first, and what happened during the fight, and whether or not there was a gun

---

4. The term "paper dragon" can refer to something that deceptively "appears to be powerful and capable." John Mac Ghlionn, *China Is No Paper Dragon*, National Review, https://www.nationalreview.com/2021/05/china-is-no-paper-dragon/ [https://perma.cc/4NBR-WBPN]. As one essayist put it, "All bark, no bite. The dragon exists, but it breathes no fire." *Id.*

present, and whether it was pointed in [Victim's] direction." The court thus denied the motion.

¶22 Graydon was the defense's only witness. In his testimony, Graydon acknowledged that he had been in a physical altercation with Victim, and his account mostly tracked Victim's, though with some key differences. Graydon testified that he was driving on Highland Drive because he was interested in moving to that area. He acknowledged that he pulled in front of Victim, but he claimed that it was not intentional and that he had simply misjudged Victim's speed. Graydon said that he then "heard a sustained car horn," which startled him, so he stopped in the road. Nothing seemed to be wrong, so he continued to drive, at which point he "started hearing horns again" and saw Victim tailgating him, "honking his horn repeatedly," "gesturing with . . . sign language," and "flashing his brights." Graydon said that he "slowed down significantly," after which Victim pulled up beside him and they "began exchanging sign language." Graydon said that he then pulled over and saw Victim pull behind him and get out of his vehicle.

¶23 Graydon said that he got out of his vehicle too and "went back to" Victim because he "wanted to get in [Victim's] face." Graydon testified that as he approached Victim, Victim had taken a "fighting position," which "put [Graydon] in a defensive posture." Graydon acknowledged that he kicked Victim before Victim began punching him.

¶24 According to Graydon, he went back to his vehicle after Victim's last punch and then turned to see Victim standing by his vehicle and giving him "a very menacing look." Graydon testified that he wanted to leave at that point but that his eye was swollen shut, thus making it hard to find his keys. Graydon said that he was worried that Victim would come after him, so he picked up his handgun—which he claimed was in "disrepair"—and "threw the slide a few times." He said that he did this to give Victim "the impression that [he] had a capable weapon," but he insisted that

he never pointed the gun at Victim. Graydon said that he then found his keys, got in his vehicle, and left. Graydon testified that he later received surgery to try to repair his eye. All in all, Graydon chalked up the incident to "a couple of guys being idiot[s] with each other."

¶25　After each side rested and presented closing arguments, the jury found Graydon guilty of aggravated assault and reckless driving. Graydon now appeals his aggravated assault conviction.

ISSUES AND STANDARDS OF REVIEW

¶26　Graydon first argues that the district court erred when it denied his motion for a directed verdict. "We review the district court's denial of a motion for directed verdict for correctness." *State v. Barner*, 2020 UT App 68, ¶ 9, 464 P.3d 190 (quotation simplified). When a defendant "challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential," and "we will uphold the district court's denial if, when viewed in the light most favorable to the State, some evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *State v. Washington*, 2021 UT App 114, ¶ 8, 501 P.3d 1160 (quotation simplified).

¶27　Second, Graydon argues that the court erred when it denied his motion for a mistrial and instead gave a curative instruction. "A trial court's denial of a mistrial motion is reviewed for [an] abuse of discretion." *State v. Dunne*, 2020 UT App 56, ¶ 18, 463 P.3d 100.

¶28　Finally, Graydon argues that the court erred by denying his motion to suppress Victim's eyewitness identification. As explained below in Part III, we conclude that the admissibility of Victim's identification is governed by rule 403 of the Utah Rules of Evidence. A district court's "decision to admit evidence under

rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion." *State v. Wright*, 2021 UT App 7, ¶ 25, 481 P.3d 479 (quotation simplified); *see also id.* ¶ 41 ("Consequently, our review is limited to determining whether the district court abused its discretion under rule 403 in admitting Eyewitness's testimony.").

## ANALYSIS

### I. Motion for a Directed Verdict

¶29 Graydon argues that the district court erred in denying his motion for a directed verdict. In Graydon's view, (A) there was insufficient evidence to show that he committed the actus reus for aggravated assault, (B) there was insufficient evidence to disprove his self-defense claim, and (C) Victim's trial testimony was inherently improbable because of inconsistencies among his various accounts of the incident. In response, the State contends that each argument was unpreserved and, in any event, meritless. We address these arguments in turn.

### A. Actus Reus of Aggravated Assault

¶30 The State charged Graydon with aggravated assault. Under the statute, aggravated assault can be committed a number of ways. *See* Utah Code § 76-5-103(2). As charged here, the State needed to prove beyond a reasonable doubt that Graydon made "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." *Id.* § 76-5-103(2)(a)(ii). In closing, the prosecutor thus argued that Graydon made a threat when "he went back to his [vehicle and] pulled the gun out." And he further argued that Graydon made a show of force when he pointed the gun in Victim's "direction and began to rack it."

¶31 On appeal, Graydon contends that the State "attempted to prove both threat and show of force by one act—Graydon's exhibition of the gun." He further contends that the State

cannot rely on a single act to prove a threat and a show of force. Put differently, Graydon argues that the State "failed to prove the actus reus of aggravated assault" because it "did not prove Graydon made *both* a threat and a separate show of force as required by statute." (Emphasis in original.) The State contends that this argument was not preserved and that Graydon has not shown plain error. We agree with the State on both fronts.

1.      Preservation

¶32    "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "[W]here a motion for a directed verdict makes general assertions but fails to assert the specific argument raised on appeal, the directed verdict motion itself is insufficient to preserve the more specific argument for appeal." *State v. Bosquez*, 2012 UT App 89, ¶ 8, 275 P.3d 1032. "Such specificity is necessary to allow the district court to assess allegations by isolating relevant facts and considering them in the context of the specific legal doctrine placed at issue." *State v. Rogers*, 2020 UT App 78, ¶ 47, 467 P.3d 880 (quotation simplified).

¶33    In his motion for a directed verdict, Graydon did not argue that the statute required "*both* a threat and a separate show of force." (Emphasis in original.) His arguments were limited to asserting that his actions weren't "true" aggravated assault because he was just "playing with his gun" and "not pointing it at" Victim. This was merely a "general assertion[]" about the sufficiency of the evidence, and it was not specific enough to alert the district court that it needed to consider whether the statute requires two separate acts. *See Bosquez*, 2012 UT App 89, ¶ 8; *see also id.* ¶ 10 ("Broadly challenging one of the elements of the charge is insufficient to preserve for appeal any and every argument that could possibly relate to that element.").

¶34 Graydon, however, asserts that this argument was preserved because the "context" would have made his objection "clear." To be sure, an issue is preserved when "the specific ground for an objection is clear from its context." *State v. Gonzalez*, 2015 UT 10, ¶ 26, 345 P.3d 1168. But even so, we still see no place in this record where Graydon argued that the statute requires separate acts to prove the threat and show of force elements. Because of this, we don't see any context that would have made it clear to the district court that Graydon was making this very particular legal argument. We are accordingly unconvinced that this argument was presented to the district court in a manner sufficient to preserve it for appellate review.

2.    Plain Error

¶35 Because this argument was unpreserved, Graydon must demonstrate that there was plain error to prevail on appeal. *See id.* ¶ 19. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *Id.* ¶ 20 (quotation simplified). "An error is obvious if from a review of the record, the appellate court is led to the conclusion that given the circumstances, the trial court should have been aware that an error was being committed at the time." *State v. Marquina*, 2020 UT 66, ¶ 30, 478 P.3d 37 (quotation simplified). To succeed, Graydon must therefore show that it should have been obvious to the district court that the State was required to point to separate acts as proof of the threat and show of force elements. But we are unpersuaded that there was any error, let alone an obvious error, because in our view, a single act can satisfy both elements within a single charged offense.[5]

_____

5. The State argues that even if separate acts were required, there was sufficient evidence for the jury to find that Graydon made a threat and displayed a show of force in this case through separate

(continued…)

¶36 Though this issue appears to have been unaddressed in a Utah appellate opinion, other courts have held that a single act or a single series of acts may be used to prove more than one element of a crime.[6] *See, e.g., State v. Jarvis*, 649 N.W.2d 186, 193 (Minn. Ct. App. 2002) ("The same sequence of events can prove multiple elements of one crime."); *State v. Mason*, 2018 WI App 57, ¶ 28 n.4, 918 N.W.2d 78 ("As with many crimes, the same act may satisfy two different elements." (quotation simplified)). To illustrate, the Minnesota Court of Appeals provided this example:

> [A] defendant pulls a pistol out of his belt and says to a man next to him with whom he was arguing, I am going to kill you. The defendant pulls the pistol up to shoulder level, aims it at the man, cocks the trigger, pulls the trigger, and kills the man. That is one series of acts. That same (one) series produces evidence that permits the state to argue the defendant (1) premeditated; (2) had intent to kill; and (3) killed a human being.

*Jarvis*, 649 N.W.2d at 193.

¶37 That same logic holds true in the assault context. As noted, aggravated assault requires the State to prove that there was "a threat, accompanied by a show of immediate force or violence, to

---

acts. But we need not address this alternative argument because we conclude that, even if there was only a single act, that act was sufficient to establish both the threat and the show of force.

6. Of course, criminal defendants may not be "twice punished for committing a single act that may violate more than one criminal statute." *State v. Bond*, 2015 UT 88, ¶ 65, 361 P.3d 104 (quotation simplified). But our holding today does not implicate the merger doctrine or the Double Jeopardy Clause because we are simply concluding that a single act may be used to prove multiple elements within a single charge of aggravated assault.

do bodily injury to another." Utah Code § 76-5-103(2)(a)(ii). "A threat is the expression of an intention to inflict injury on another through conduct or words." *Layton City v. Carr*, 2014 UT App 227, ¶ 8, 336 P.3d 587 (quotation simplified). As for the "show of force" element, that phrase is not defined in the Utah Code, and so far as we can tell, no Utah case has defined it either. But the parties here have agreed that it refers to a "display of one's power, influence or capability to cause harm, meant to act as a warning or deterrent to others." Though we need not decide whether this is the definitive definition for this phrase, this seems to be a reasonable expression of what it means. Accepting this definition for purposes of this appeal, we see no error in the decision at issue.

¶38    It's true that a single act might not always satisfy both the threat element and the show of force element. A person could conceivably threaten another without making a show of force (such as through a verbal threat, unaccompanied by anything else), and a person might also make a show of force without making any threat. But this doesn't mean that, under some circumstances, a single act couldn't satisfy both elements. Suppose that A and B have just been in a confrontation or have some history of hostility. Against such a backdrop, if A silently points a gun at B, this single act could serve as both an expression of A's intention to inflict injury on B through conduct (i.e., the threat), as well as a display of A's power, influence or capability to cause harm, meant to act as a warning or deterrent to B (i.e., the show of force).

¶39    The same is true here. Again, in this procedural posture, we must view the evidence "in the light most favorable to the State." *State v. Washington*, 2021 UT App 114, ¶ 8, 501 P.3d 1160 (quotation simplified). So viewed, the circumstances that led to the "single act" in question were these: after having a fairly aggressive on-the-road dispute about each other's driving, Graydon and Victim pulled over to the side of the road, got out of their vehicles, and engaged in a physical altercation in which each landed blows and which culminated in Victim repeatedly

punching Graydon in the face. After the two returned to their respective vehicles, Graydon then performed the "single act" in question—namely, he pointed a handgun in Victim's general direction. Against the backdrop of the just-concluded confrontation, a jury could conclude that when Graydon pointed the gun in Victim's direction, he both threatened Victim and made a show of force, thereby providing some evidence from which the jury could conclude that each element had been proven.

¶40 Graydon, however, points to the statutory phrase "accompanied by" and argues that this phrase would be meaningless if a single act could constitute both a threat and a show of force. But we read that language as requiring there to be both a threat and a show of force. As explained, however, this can be accomplished through a single act or through multiple acts. We disagree with Graydon's suggestion that this phrase requires separate acts for each element.

¶41 Graydon also points to several Utah cases affirming assault convictions and contends that they support his conclusion that there must be a threat and a separate show of force. Although some of these cases involve separate acts, *see, e.g.*, *State v. Brown*, 853 P.2d 851, 860 (Utah 1992) (defendant "raised a crescent wrench in his hand, pulled it back," and said, "Do you want some of it too?"), none of them state that separate acts are required. And having considered the issue here, we see no basis for imposing such a requirement in either the statutory text or the understood meanings of its terms.

¶42 Because of all this, we conclude that the court did not err, let alone obviously err, when it determined that the State presented sufficient evidence that Graydon made "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." Utah Code § 76-5-103(2)(a)(ii). This is so because, even if the State did rely on a single act, that act could establish both elements.

B.    Self-Defense

¶43    Graydon next argues that the district court should have granted his motion for a directed verdict because the State failed to disprove self-defense. Graydon makes three arguments in support of this claim, but we reject all three because there was sufficient evidence to disprove self-defense.[7]

¶44    Graydon first argues that he was acting in self-defense because he was not the initial aggressor. *See* Utah Code § 76-2-402(3)(a)(iii) (establishing that an individual who "was the aggressor" "is not justified in using force"). In support, Graydon asserts that Victim "began the confrontation by coming dangerously close to Graydon's rear bumper, honking his horn and jockeying for a place with Graydon, pulling over first, exiting his vehicle first, and initiating the fight." (Quotation simplified.) But this argument presents the evidence in the light most favorable to Graydon, not the State.

¶45    Viewed in the light most favorable to the State, however, the evidence demonstrated that Graydon pulled in front of Victim, Victim then drove past Graydon because Graydon had stopped in the middle of the road, and Victim pulled over only because Graydon accelerated past him and was swerving all over the road. Moreover, Victim testified that Graydon ran toward him, said, "Let's go," kicked him in the side, and attempted to punch him. Indeed, in Graydon's own testimony, he confirmed that he made the first physical contact when he kicked Victim. From all this, there was at least some evidence from which the

---

7. The State asserts that Graydon's self-defense arguments were not preserved. Where "the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (quotation simplified). This is so here.

jury could conclude that it was Graydon—not Victim—who was the initial aggressor. *See Washington*, 2021 UT App 114, ¶ 8.

¶46 Graydon next argues that, even if he was the aggressor in the initial stages of the confrontation, Victim's "use of force" during their physical exchange was "disproportionate to Graydon's use of force." In Graydon's view, this was so because, after Victim's first punch knocked Graydon to the ground and damaged his eye, Victim "continued to punch Graydon in the head even though Graydon had been neutralized as a potential threat." As a result, Graydon argues that Victim had become the aggressor by the time Graydon exhibited his gun, thereby allowing Graydon to then display the gun as an act of self-defense against that aggression.

¶47 It's true, of course, that the "law on self-defense does not allow for disproportionate use of defensive force," and it's likewise true that "using force in excess of the amount necessary to subdue any threat posed by another person is unjustified and unreasonable." *State v. Wall*, 2020 UT App 168, ¶ 19, 479 P.3d 355 (quotation simplified). But the problem with Graydon's argument is that he again doesn't view the evidence in the light most favorable to the State. Victim testified that he hit Graydon "a couple more times" after Graydon was on the ground because he was afraid that Graydon would get up and try to punch or kick him again. He also testified that he stopped hitting Graydon once Graydon said, "I've had enough." This was sufficient evidence from which the jury could conclude that Victim used only the amount of force "necessary to subdue any threat posed by" Graydon, *see id.* (quotation simplified), thereby also allowing the jury to conclude that Graydon was not acting in self-defense when he returned to his vehicle and grabbed his gun.

¶48 Finally, Graydon argues that he was justified in displaying his gun because Victim "remained a threat by maintaining a menacing stance, not driving away from the scene, and prolonging the encounter by chasing Graydon when Graydon

drove away." (Quotation simplified.) But the fight was over and the two men had already separated when Graydon grabbed his gun. Moreover, Victim testified that he didn't leave because there was a car parked behind him and he was afraid to drive past Graydon. And even though Graydon testified that Victim had "a menacing look" and he was afraid Victim would "make some kind of move," Graydon never testified that Victim attempted to make any such move. Furthermore, Victim's actions after Graydon displayed the gun—such as driving after Graydon—cannot retroactively justify Graydon's decision to display the gun earlier. Viewing the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to disprove Graydon's claim that he was justified in displaying his gun.

¶49 In short, because the State presented sufficient evidence to disprove self-defense, the court did not err in rejecting Graydon's motion for a directed verdict on this point.

C. Inherent Improbability

¶50 Graydon argues that there was insufficient evidence to convict him because Victim's testimony was inherently improbable. We disagree. Although there were some inconsistencies in Victim's account, we conclude that his overall accounts were at least materially consistent. As a result, the inconsistencies didn't warrant a directed verdict.[8]

¶51 "We are not normally in the business of reassessing or reweighing evidence, and we resolve conflicts in the evidence in favor of the jury verdict." *State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (quotation simplified). "In some unusual circumstances," however, "we will conclude that the testimony presented to the jury was so unreliable that it cannot form the basis of a

---

8. The State contends that this argument is unpreserved. But because we easily resolve this issue in the State's favor, we do not address this argument. *See Kitches*, 2021 UT App 24, ¶ 28.

conviction." *Id.* (quotation simplified). Such unusual circumstances exist when the testimony is "so inconclusive or inherently improbable that it could not support a finding of guilt beyond a reasonable doubt." *Id.* (quotation simplified).

¶52 Our supreme court has "identified three factors that merit consideration under an inherently improbable analysis: *material* inconsistencies, patent falsehoods, and lack of corroborating evidence." *State v. Jok*, 2021 UT 35, ¶ 32, 493 P.3d 665 (emphasis added). But the court has also cautioned that the "proper test is, and always has been, whether reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *Id.* (quotation simplified).

¶53 The thrust of Graydon's argument is that Victim's four accounts were so inconsistent with each other that Victim's testimony became inherently improbable. In support of this argument, Graydon identifies eleven inconsistencies from Victim's accounts. And indeed, there were some inconsistencies. For example, Victim's accounts varied about how hard he braked when Graydon pulled in front of him, how close he got to Graydon when Graydon pulled in front of him, whether he honked at Graydon, and whether Graydon gestured for him to pull over. Furthermore, Graydon notes that when Victim spoke to Officer 2, he called Graydon a "paper dragon," but that at trial, Victim said he didn't even know what "paper dragon" meant.

¶54 In our view, however, neither these nor any other identified inconsistency rendered Victim's testimony "so unreliable that it [could not] form the basis of a conviction." *Prater*, 2017 UT 13, ¶ 32. This is because Victim's various accounts were still *materially* consistent. *Cf. Jok*, 2021 UT 35, ¶ 27 (holding that testimony was not inherently improbable where it was "overwhelmingly consistent and free from statements that would have cast substantial doubt on [the witness's] testimony"). Even with the differences identified by Graydon, Victim consistently said the following: Graydon abruptly pulled in front of Victim

and stopped; Victim drove around Graydon; Graydon sped past Victim and started swerving; Victim pulled over and got out of his truck; Graydon pulled over, got out of his vehicle, and approached Victim; Graydon kicked Victim and tried to hit him; Victim punched Graydon several times; after the fight, the two men went back to their vehicles; Graydon then pulled out a gun and racked it several times; Victim wanted to leave but couldn't back up; and when Graydon left, Victim tried to follow him but gave up and called 911.[9]

¶55    These details about the fight at the side of the road were central to the State's proposed narrative of what happened that night. And more particularly, the details about Graydon's use of the gun were the basis for the charged offense. As a result, these details were far more important to the case than the ones identified by Graydon and about which Victim was sometimes inconsistent. Given that Victim was consistent about these material details, we are unpersuaded that the inconsistencies identified by Graydon rendered Victim's testimony so inherently improbable that it could not be relied on by the jury. As a result, the district court appropriately let the jury decide how much weight to place on the inconsistencies identified by Graydon. *See State v. Workman*, 852 P.2d 981, 984 (Utah 1993) ("When the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence.").

¶56    Graydon, however, contends that these inconsistencies are meaningful because "there was no physical or testimonial

---

9. We also note that Victim provided more detail in some accounts than others. For example, Victim's description of the incident at the motion to suppress hearing was short in comparison to the description he gave at trial. But that's not surprising, because the purpose of the motion to suppress hearing was to assess the reliability of Victim's eyewitness identification, not necessarily to detail everything that happened.

evidence" corroborating Victim's testimony. We disagree with this description of the evidence. Graydon testified at trial, and much of his own account matched the account given by Victim. Like Victim, Graydon testified that he made "a regular driving error" and pulled in front of Victim, that the two men pulled over, that a fight started when Graydon kicked Victim, and that he eventually went back to his vehicle, pulled out his gun, and "threw the slide a few times." Although Graydon nevertheless described Victim as the aggressor, his sworn testimony still corroborated Victim's core claims that Graydon kicked him first and later pulled out a gun and tried to rack it. As a result, we are not convinced that Victim's testimony was wholly uncorroborated.

¶57 Finally, Graydon contends that Victim's testimony was "incredibly dubious." *See State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288 (holding "that the definition of inherently improbable must include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false"). This is so, according to Graydon, because Victim failed "to recognize his role in the incident" and because Victim "presented himself as an innocent, naive family man" despite also testifying that he hit Graydon several times and "wanted to bring him to justice." But from our review, Victim's testimony doesn't "run so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *Jok*, 2021 UT 35, ¶ 36 (quotation simplified). Victim testified that Graydon was the aggressor, that he hit Graydon in self-defense, and that he wanted Graydon to be held responsible for what he had done. We don't view that as "incredibly dubious." A jury could have decided that Victim was insincere, of course, but we are not persuaded that all reasonable jurors must have doubted Victim's sincerity for the reasons given by Graydon.

¶58 In short, although there were some inconsistencies in Victim's accounts regarding some of the details, we are not persuaded that these inconsistencies were so serious that

"reasonable minds must have entertained a reasonable doubt that [Graydon] committed the crime." *Id.* ¶ 32 (quotation simplified). The district court therefore did not err in submitting the case to the jury.

## II. Motion for a Mistrial

¶59    As noted, Officer 1 testified that there had been "a similar situation several years earlier" involving Graydon. Counsel moved for a mistrial as a result, but the district court denied the motion and gave a curative instruction instead. On appeal, Graydon argues that the court erred by not granting a mistrial. We disagree.

¶60    "A trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary in order to avoid injustice." *State v. Dunne*, 2020 UT App 56, ¶ 18, 463 P.3d 100 (quotation simplified). "A district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings." *Id.* (quotation simplified). Thus, "once a district court has exercised its discretion and denied a motion for a mistrial, an appellate court will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *Id.* (quotation simplified).

¶61    Our supreme court has cautioned that "a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730. This was the case here. When Officer 1 stated that "there was a similar situation several years earlier," this was not responsive to any question from the prosecutor that had asked for this kind of information. When Counsel objected, the prosecutor immediately rephrased his question to ask about Officer 1's attempts to locate Graydon. Officer 1 did not then expound on the

alleged prior incident any further. Given this, it seems apparent that the challenged statement was "not intentionally elicited," was "made in passing," and was "relatively innocuous." *Id.* We are thus not persuaded that a mistrial was essential to avoiding injustice. *See Dunne*, 2020 UT App 56, ¶ 18.

¶62 Our conclusion is further strengthened by the district court's subsequent curative instruction, wherein it instructed the jury not to consider Officer 1's reference to a "similar situation." "Curative instructions are ordinarily presumed on appeal to be effective, absent a substantial and prejudicial underlying error or irregularity." *State v. Curtis*, 2013 UT App 287, ¶ 25, 317 P.3d 968 (quotation simplified); *see also State v. Harmon*, 956 P.2d 262, 271 (Utah 1998) (describing curative instructions as "a settled and necessary feature of our judicial process and one of the most important tools by which a court may remedy errors at trial"); *State v. Hodges*, 517 P.2d 1322, 1324 (Utah 1974) ("In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing to their duty, and that they followed the instructions of the court."). Graydon has not offered any persuasive reason why we should conclude that this presumption was overcome in this case, and we see none either.

¶63 Moreover, in past cases, Utah appellate courts have repeatedly held that a curative instruction was an appropriate alternative to a mistrial. *See, e.g.*, *State v. Vallejo*, 2019 UT 38, ¶¶ 90–100, 449 P.3d 39; *State v. Neilson*, 2017 UT App 7, ¶¶ 16–19, 391 P.3d 398; *State v. Allred*, 2002 UT App 291, ¶¶ 19–20, 55 P.3d 1158. And there's good reason to think that the curative instruction here effectively ameliorated any harm caused by Officer 1's comment. In addition to instructing the jury to not "consider anything from the past," the court went further and instructed the jury "that there is no prior similar incident." The court specifically told the jury that Graydon did not "have a prior road rage" incident or "any prior aggravated assaults." So in addition to instructing the jury to disregard the challenged statement—an instruction that

likely would have been sufficient on its own—the court also told the jury that Officer 1's comment about a prior "similar situation" was actually inaccurate. We don't see any basis for concluding that the jury would have disregarded this direct instruction and relied on the comment anyway.

¶64　In sum, given the passing nature of Officer 1's statement and the curative instruction, the district court did not abuse its discretion by denying Graydon's motion for a mistrial.[10]

---

10. In further support of this argument, Graydon points to Officer 1's statements at trial that Graydon was a "danger to himself [and a] danger to other people and [the] officers involved" and that the officers "didn't want to put anyone else in danger." Graydon contends that these statements were "impermissible comments on Graydon's character trait of being violent or peaceful." *See* Utah R. Evid. 404(a)(1). But Counsel did not object to these statements, so Graydon must show plain error, and as part of this, he must show that the error should have been obvious to the court. *See State v. Johnson*, 2017 UT 76, ¶¶ 18–20, 416 P.3d 443. Graydon has not shown plain error because, from our review of the record, it does not seem obvious that Officer 1 was providing character evidence when he made these statements.

　　"Character evidence is evidence of a person's good or bad character—whether or not they are a generally good-hearted person with positive qualities." *State v. Richins*, 2021 UT 50, ¶ 10 n.2, 496 P.3d 158 (quotation simplified). It also includes "evidence of specific traits or propensities a person might have, some of which might be negative even if the person could be considered generally a good person." *Id.* (quotation simplified). Officer 1's testimony was not obviously evidence of whether Graydon was a "good-hearted person" or whether he had "specific traits or propensities." *See id.* (quotation simplified). Rather, Officer 1 appears to have been explaining why he and other officers decided not to speak with Graydon. Because this testimony was

(continued…)

## III. Eyewitness Identification

¶65    Graydon's final argument is that the district court erred when it rejected his motion to exclude Victim's eyewitness identification. We first identify the controlling law and then apply that law to the facts of this case.[11]

A.    Controlling Law

¶66    Graydon contends that we should review the district court's decision under *State v. Ramirez*, 817 P.2d 774 (Utah 1991), *State v. Lujan*, 2020 UT 5, 459 P.3d 992, and rules 403 and 617 of the Utah Rules of Evidence. The State, however, asserts that the admissibility of Victim's identification should be assessed under rule 403 only. We agree with the State.

¶67    Utah courts previously evaluated eyewitness identifications under *Ramirez*, which "identified five factors for courts to consider in assessing the reliability (and hence admissibility) of eyewitness identification testimony under the due process clause of the Utah Constitution." *Lujan*, 2020 UT 5, ¶ 1. But in *Lujan*, "our supreme court clarified that the admissibility of eyewitness identification testimony is to be measured in the first instance by our rules of evidence rather than

---

grounded in the events of that evening, it was not obviously an effort to show that Graydon "acted in conformity with" a "character or trait." *See* Utah R. Evid. 404(a)(1). There was accordingly no plain error.

11. The State contends that rule 403 of the Utah Rules of Evidence is the controlling law and that because Graydon's argument below was not based on rule 403, his arguments on appeal are not preserved. Although we agree that rule 403 is the controlling law, we do not address the State's preservation argument because we can easily resolve this issue in its favor. *See Kitches*, 2021 UT App 24, ¶ 28.

by any due process standard." *State v. Wright*, 2021 UT App 7, ¶ 34, 481 P.3d 479 (quotation simplified). In other words, concerns about the reliability of an eyewitness identification "are more appropriately addressed by our rules of evidence" than by the *Ramirez* standard. *Id.* (quotation simplified). As a result, our inquiry is guided by the Utah Rules of Evidence and not the *Ramirez* factors.[12] *See id.* ¶¶ 39–40 (reviewing the admissibility of eyewitness testimony under rule 403 and not *Ramirez*).

---

12. "While the threshold standard of admissibility of eyewitness testimony is provided by the Utah Rules of Evidence, the governing case law preserves a role for due process." *State v. Lujan*, 2020 UT 5, ¶ 46, 459 P.3d 992. "When eyewitness identification evidence is secured by unnecessarily suggestive police action, the federal Due Process Clause adds a constitutional backstop to our rules of evidence." *Id.* (quotation simplified). And Utah Supreme Court cases have "established a similar backstop under the due process clause of the Utah Constitution." *Id.* Accordingly, "the *Ramirez* factors are entitled to *stare decisis* respect, and will not be overridden, insofar as they provide 'guidance' of relevance to the purpose for which they have been applied in [Utah Supreme Court] case law—as possible considerations in assessing whether evidence produced as a result of suggestive police activity should be excluded on the ground that it leads to a substantial likelihood of misidentification." *Id.* ¶ 49.

Graydon's argument is that Victim tainted his own memory by looking at Graydon's Facebook profile. But because he doesn't suggest that the police were involved in this alleged tainting, we don't read his argument as implicating the federal Due Process Clause. *See Perry v. New Hampshire*, 565 U.S. 228, 233 (2012) ("When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the

(continued…)

¶68 Against that backdrop, Graydon identifies two potentially relevant rules of evidence. First, he points to rule 403, which allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice." Utah R. Evid. 403. Second, he points to rule 617, which "establishes factors and standards for a trial court to employ in judging the admissibility of eyewitness testimony." *Lujan*, 2020 UT 5, ¶ 30; *see also* Utah R. Evid. 617.

¶69 The district court denied Graydon's motion to suppress in December 2018. And when Graydon raised the issue again at trial in May 2019, the court again ruled that the testimony was admissible. Rule 617 was not adopted until November 2019, almost a year after the court denied the motion to suppress and months after the conclusion of Graydon's trial. *See* Utah R. Evid. 617.

¶70 As a result, rule 617 was not in effect when the court ruled on Graydon's motion to exclude. We accordingly do not apply rule 617 and instead focus our analysis on rule 403, which was in effect when Graydon moved to suppress Victim's identification.

---

presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.").

It is an open question "whether the Utah due process clause establishes a freestanding guarantee of the reliability of eyewitness identification testimony that would attach in the absence of state action." *Lujan*, 2020 UT 5, ¶ 25. But Graydon has not adequately briefed or argued the existence of such a "freestanding guarantee," so we will not answer that question in this appeal. *See generally* Utah R. App. P. 24(a)(8) ("The argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal.").

*See Lujan*, 2020 UT 5, ¶ 31 (explaining that rule 617 "was not in place at the time of the trial in [the relevant] proceeding" and thus "could not have been applied" and that the rules in place at the time "could and should have been applied"); *Wright*, 2021 UT App 7, ¶ 37 n.3 (noting that *Lujan* "makes clear that the district court would have been required to apply rule 403 only, given that rule 617 was not in effect at the time of trial"); *id.* ¶ 25 (explaining that "our supreme court recently clarified that for cases to which the new rule 617 of the Utah Rules of Evidence does not apply, a district court's analysis to determine the admissibility of eyewitness identification is rooted in rule 403 of the Utah Rules of Evidence"); *see also State v. Clopten*, 2009 UT 84, ¶ 37, 223 P.3d 1103 (declining to apply the then-current version of rule 702 of the Utah Rules of Evidence because it was not the law that existed at the time of the trial).

B.      Application of Rule 403

¶71     Because we assess the district court's decision under rule 403, we will not reverse unless it was an abuse of discretion for the court to admit Victim's identification. *See Wright*, 2021 UT App 7, ¶ 25. A district court "abuses its discretion under rule 403 if its decision to admit or exclude evidence is beyond the limits of reasonability." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (quotation simplified). Here, Graydon argues that the "probative value" of Victim's eyewitness identification was "substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. We disagree.

¶72     Our decision in *Wright* provides a useful comparison. There, an eyewitness to a shooting described the shooter's appearance and noted that the shooter had worn a wig. 2021 UT App 7, ¶ 5. He also viewed a photographic lineup and identified the defendant with "eighty to ninety percent certainty." *Id.* ¶ 17. After the defendant was arrested and charged, the eyewitness identified him again, "this time with one hundred percent certainty." *Id.* Between the two identifications, the eyewitness had

downloaded the defendant's photo and "digitally superimposed various wigs on the photo until he came up with an image that he believed matched the shooter." *Id.* The defendant attempted to suppress the identification, but the court denied the motion. *Id.* ¶ 18.

¶73    On appeal, we outlined the findings made by the district court, which included the following: (1) the eyewitness "had a sufficient opportunity to view the shooter," and "it was light outside[] with no distracting noises, activity, or other circumstances affecting [the eyewitness's] opportunity to observe the shooter," *id.* ¶ 45 (quotation simplified); (2) the eyewitness's "attention was sufficiently focused on the shooter to provide a reliable identification," *id.* ¶ 46; (3) neither stress nor "witness characteristics . . . had any appreciable impact on [the eyewitness's] capacity to observe the shooter," *id.* ¶ 47 (quotation simplified); (4) the details that the eyewitness was able "to provide on the day of the shooting and consistently recall thereafter demonstrated that his eventual identification of [the defendant] in the photo-lineup was not tainted by memory decay," *id.* ¶ 48; and (5) "because it was not ordinary for [the eyewitness] to observe an argument escalating to murder, the nature of the event made it highly likely that [the eyewitness] would correctly perceive, remember, and relate his observations," *id.* ¶ 49. Given these findings, we saw "no abuse of discretion in the district court's conclusion that [the eyewitness's] testimony was admissible."[13] *Id.* ¶ 51.

---

13. The district court in *State v. Wright*, 2021 UT App 7, ¶ 41, 481 P.3d 479, evaluated the eyewitness identification using the *Ramirez* factors. On appeal, the defendant asked for a remand so that the district court could assess the identification under rule 403 of the Utah Rules of Evidence. *Id.* ¶ 43. We acknowledged that a rule 403 analysis is not identical to a *Ramirez* analysis, but we also concluded that they are "quite similar." *Id.* ¶ 42. And we

(continued…)

¶74    Here, the district court made several similar findings that likewise indicated that Victim's identification was reliable. Of note, the court found that (1) Victim "had sufficient opportunity to observe the person assaulting him for 20–30 seconds at close range"; (2) "it was light outside"; (3) Victim's "attention was completely on the person assaulting him"; and (4) Victim "was wearing contacts giving him clear vision, and [he] was not on any substances that would impair his vision or mental acuity." And although the court acknowledged that Victim's independent research was problematic, it still concluded that the identification was sufficiently reliable to be admitted. In essence, the court decided that the probative value of Victim's identification was not

---

ultimately declined to remand the case, explaining "that the district court evaluated the relevant reliability factors and thus substantively made a rule 403 inquiry, even if it never *explicitly* invoked the rule." *Id.* ¶ 43 (emphasis in original).

The district court here also applied the *Ramirez* factors, as that was the governing law at the time. But Graydon has not requested that we remand this case for further consideration. And, as in *Wright*, we think the district court here "substantively made a rule 403 inquiry" because its oral and written rulings both indicate that it weighed the relevant variables before concluding that the identification was sufficiently reliable. *See Lujan*, 2020 UT 5, ¶¶ 36–38 (identifying variables that "may be considered in assessing both the probative value of a given piece of eyewitness identification testimony and the possibility of it producing unfair prejudice"). We are thus comfortable reviewing the court's decision under rule 403, even though its analysis was not explicitly based on that rule. *See Wright*, 2021 UT App 7, ¶ 41 (explaining that "appellate review of evidentiary decisions should only assess whether the district judge made an error in admitting or excluding the evidence in question and should thus affirm so long as the trial court made the right decision, even if it was for a mistaken reason" (quotation simplified)).

substantially "outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403.

¶75    In our view, the court's decision was not "beyond the limits of reasonability." *Cuttler*, 2015 UT 95, ¶ 12 (quotation simplified). Although it is possible that Victim's independent research tainted his memory, there was also good reason to think the identification was still reliable. As the district court found, Victim had a good opportunity to view Graydon and "was not on any substances that would impair his vision or mental acuity." Moreover, Victim's description of Graydon and his vehicle (both of which he provided well before he ever conducted the Facebook search) also matched information about Graydon that Wife independently gave to police. We thus don't see an abuse of discretion in the court's decision that Victim's identification was sufficiently reliable to be admissible.[14]

---

14. While our conclusion above is both warranted under and properly grounded in Utah law, we also note that courts in other jurisdictions have reached similar conclusions in similar cases. *See State v. Lively*, 153 So. 3d 1061, 1070–71 (La. Ct. App. 2014) (holding that a court did not err in admitting eyewitness testimony even though the eyewitness saw the defendant's photo on the news before selecting the same photo in a police lineup); *Commonwealth v. Fielding*, 119 N.E.3d 328, 332–33 (Mass. App. Ct. 2019) (holding that the trial court did not abuse its discretion by admitting eyewitness testimony even though someone showed the eyewitness the defendant's Facebook page before the eyewitness identified the defendant); *State v. Butler*, 642 S.W.3d 364, 371–72 (Mo. Ct. App. 2022) (holding that a court did not abuse its discretion in admitting eyewitness testimony even though the eyewitness first identified the defendant by looking at Facebook photos shown to her by a relative); *State v. Webster*, 104 A.3d 203, 205–09 (N.H. 2014) (holding that eyewitness testimony was admissible even though the eyewitnesses saw the defendant's

(continued…)

¶76   To be clear: this isn't to say that Victim's Facebook search was irrelevant, and our decision today should not be read as an endorsement of Victim's independent research. We are simply holding that, to the extent that there were problems with Victim's identification, those problems went to the weight of Victim's testimony, not its admissibility. *See State v. Guzman*, 2004 UT App 211, ¶ 31, 95 P.3d 302 (holding that an eyewitness's testimony about how confident she was in her identification was "relevant once the eyewitness identification [was] deemed admissible, insofar as it assists the jury's evaluation of the credibility of the identification testimony and the weight to be accorded it"); *see also State v. Brown*, 528 N.E.2d 523, 533 (Ohio 1988) ("The alleged suggestiveness of the identification, therefore, goes to weight and reliability of the testimony rather than admissibility."). Graydon could (and in fact did) put this issue before the jury by cross-examining Victim about his identification, and he could have gone further by presenting relevant expert testimony about this. But under the circumstances of this case, we are unpersuaded

---

booking photo online and in the newspaper before they identified the defendant); *State v. Brown*, 528 N.E.2d 523, 532–33 (Ohio 1988) (holding that it was not error to admit eyewitness identification when the eyewitness originally could not identify the defendant but later identified her when he saw her walking through the courthouse and "that any prejudicial effect of the testimony could have been cured by effective cross-examination"); *State v. Reid*, 91 S.W.3d 247, 271–73 (Tenn. 2002) (holding that it was not error to admit an eyewitness's identification even though the eyewitness was unable to identify the defendant in a photo lineup and identified the defendant only after seeing his arrest on television).

that the court abused its discretion by allowing the State to present Victim's identification in the first instance.[15]

## CONCLUSION

¶77 The State presented sufficient evidence to support Graydon's convictions, so the district court did not err in denying his motion for a directed verdict. And the court did not abuse its discretion when it denied Graydon's motion for a mistrial and motion to suppress. For these reasons, we affirm Graydon's conviction.

_____

15. Graydon argues that the cumulative effect of the claimed errors requires reversal. But because there are no errors to accumulate, the cumulative error doctrine is inapplicable. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038.